# 23-6909-cr

To be argued by:
**ALLEGRA GLASHAUSSER**

United States Court of Appeals
For the Second Circuit

Docket No. 23-6909-cr

UNITED STATES OF AMERICA,

Appellee,

-against-

VICTORIA DAVIDSON,

Defendant,

GEORGE GULDI,

Defendant- Appellant.

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLANT GEORGE GULDI**

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**GEORGE GULDI**

**ALLEGRA GLASHUSSER,**
*Of Counsel*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iv

Statement of Jurisdiction ........................................................................................ 1

Question Presented ................................................................................................. 2

Statement of the Case ............................................................................................. 2

Statement of Facts .................................................................................................. 3

Introduction ............................................................................................................ 3

Motions in Limine .................................................................................................. 5

Trial ........................................................................................................................ 6

    Mr. Guldi told Davidson to call Ditech and ask who sent the money, which
    he believed the District Attorney had illegally moved from his accounts ................ 8

    Mr. Guldi reiterated his belief that the DA gave Mr. Guldi's money to Ditech
    and again told Davidson she should ask Ditech who made the payment ............... 10

    Mr. Guldi told Davidson that he was not ready to authorize her to speak
    to Ditech on his behalf ................................................................................... 11

    Unbeknownst to Mr. Guldi, who never gave written authorization to
    Davidson to speak on his behalf, Davidson called Ditech 19 times,
    lying repeatedly ............................................................................................. 12

    Davidson lied about sending Ditech a power of attorney from Mr. Guldi,
    which Mr. Guldi did not complete until after Davidson got the money ................ 13

    Davidson repeatedly lied to Mr. Guldi, telling him she had not received the
    money, when she had ...................................................................................... 14

    By the time Davidson told Mr. Guldi she had received the money, 11 days
    afterward, she had already gotten a "battery of bank checks" ............................. 15

i

In subsequent calls, Davidson and Mr. Guldi disagreed as Davidson resisted Mr. Guldi's requests that she use the money to pay off Mr. Guldi's debts .............. 16

Davidson had already converted over $140,000 into cashier's checks before she even told Mr. Guldi she had the money .................................... 17

Motion to Dismiss ........................................................................................ 18

Charge conference, jury instructions, and verdict ............................................ 19

Sentencing ........................................................................................................ 21

Guidelines calculation and objection to enhancement for using sophisticated means .................................................................................................................... 23

Sentencing proceeding ................................................................................ 24

Summary of Argument .................................................................................. 28

Argument .......................................................................................................... 29

Point I

The evidence was insufficient to prove that George Guldi A) conspired with Victoria Davidson, who acted on her own in forging his name and lying to Ditech; B) had any fraudulent intent when he repeatedly and credibly said that he thought the money was his; or C) aided or abetted Davidson, who lied to him, in committing fraud. .......................................... 29

A. Standard of review ............................................................. 29

B. The government did not prove beyond a reasonable doubt that Mr. Guldi agreed with Davidson to commit any crime ....................................... 30

C. The evidence was insufficient to show that Mr. Guldi had a fraudulent intent ……………………………………………………………...34

D. Mr. Guldi also lacked the necessary intent to be convicted of aiding and abetting Davidson ....................................................................... 38

Point II

The court incorrectly instructed the jury, *inter alia*, that Mr. Guldi could be guilty based on Davidson's actions *before* he had joined a conspiracy with her – even though she had no other alleged co-conspirators, and *before* he joined her fraudulent scheme..........................................................................39

    A.  The court's charge to the jury that Mr. Guldi could have joined an ongoing conspiracy and refusal to charge to the jury that the acts of the conspiracy had to be reasonably foreseeable were error.........................39

    B.  The court's charge that Mr. Guldi could be guilty of wire fraud even if he joined at a "later point" based on Davidson's "past" actions was erroneous.........................................................................................41

    C.  The court's charge undermined the defense that Mr. Guldi lacked a fraudulent intent because he believed the money was his ...........................42

Point III

The court erred in sentencing Mr. Guldi, who was 70 years old, in treatment for prostate cancer, and struggling with a host of other serious medical conditions, to 36 months of imprisonment based on an incorrect guidelines calculation and the government's unfounded assurances that prison would provide him appropriate treatment. ........................................................44

    A.  Standard of Review.............................................................................44

    B.  The sophisticated means enhancement does not apply...............................46

    C.  The court's reliance on the government's unsupported assurances that the BOP could adequately treat Mr. Guldi's medical conditions was error.............................................................................................50

Conclusion..............................................................................................54

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*,
   552 U.S. 38 (2007).................................................................... 45

*Gomez v. United States*,
   No. 21-2632, 2023 WL 8046326 (2d Cir. Nov. 21, 2023)......................... 40

*Jackson v. Virginia*,
   443 U.S. 307 (1979).................................................................. 30

*Kimbrough v. United States*,
   552 U.S. 85 (2007).................................................................... 44

*Levine v. United States*,
   383 U.S. 265 (1966).................................................................. 42

*Ocasio v. United States*,
   578 U.S. 282 (2016).................................................................. 33

*People v. Guldi*,
   59 N.Y.S.3d 385 (2d Dep't 2017)................................................ 37

*Pinkerton v. United States*,
   328 U.S. 640 (1946).................................................................. 40

*Rosemond v. United States*,
   572 U.S. 65 (2014).................................................................... 38

*United States v. Aina-Marshall*,
   336 F.3d 167 (2d Cir. 2003) ....................................................... 39

*United States v. Ali*,
   631 F. App'x 80 (2d Cir. 2016) .............................................. 46, 50

*United States v. Best*,
   219 F.3d 192 (2d Cir. 2000) ....................................................... 38

*United States v. Blackmon*,
   839 F.2d 900 (2d Cir. 1988)...................................................41-42

*United States v. Booker*,
   543 U.S. 220 (2005).................................................................. 45

*United States v. Branen,*
17 F.3d 552, 556 (2d Cir. 1994) .................................................. 39

*United States v. Calderon,*
944 F.3d 72 (2d Cir. 2019) ........................................................ 43

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) ...................................................... 45

*United States v. Chacko,*
169 F.3d 140 (2d Cir. 1999) ...................................................... 36

*United States v. Chandler,*
98 F.3d 711 (2d Cir. 1996) ........................................................ 35

*United States v. D'Amato,*
39 F.3d 1249 (2d Cir. 1994) ...................................................... 35

*United States v. Dinome,*
86 F.3d 277 (2d Cir. 1996) ........................................................ 36

*United States v. Dorvee,*
616 F.3d 174 (2d Cir. 2010) ...................................................... 44

*United States v. Doyle,*
130 F.3d 523 (2d Cir. 1997) .................................................. 39, 40

*United States v. Espaillet,*
380 F.3d 713 (2d Cir. 2004) ...................................................... 30

*United States v. Fama,*
636 F. App'x 45 (2d Cir. 2016) .............................................. 46, 51

*United States v. Feigenbaum,*
962 F.2d 230 (2d Cir. 1992) .................................................. 46, 54

*United States v. Fofanah,*
765 F.3d 141 (2d Cir. 2014) .................................................. 45, 48

*United States v. Glenn,*
312 F.3d 58 (2d Cir. 2002) ........................................................ 30

v

*United States v. Gole,*
    158 F.3d 166 (2d Cir. 1998) ........................................................ 37

*United States v. Gore,*
    154 F.3d 34 (2d Cir. 1998) .......................................................... 33

*United States v. Greenberg,*
    835 F.3d 295 (2d Cir. 2016) ........................................................ 35

*United States v. Hamilton,*
    587 F.3d 11995 (10th Cir. 2009) ................................................ 42

*United States v. Hasan,*
    586 F.3d 161 (2d Cir. 2009) ........................................................ 45

*United States v. Hassan,*
    578 F.3d 108 (2d Cir. 2008) ........................................................ 31

*United States v. Jabar,*
    19 F.4th 66, 76 (2d Cir. 2021) ............................................... 35, 36

*United States v. Jones,*
    393 F.3d 107 (2d Cir. 2004) ........................................................ 30

*United States v. Kostakis,*
    364 F.3d 45 (2d Cir. 2004) .......................................................... 50

*United States v. Kozeny,*
    667 F.3d 122 (2d Cir. 2011) ........................................................ 30

*United States v. Leslie,*
    103 F.3d 1093 (2d Cir. 1997) ...................................................... 29

*United States v. McPartland,*
    81 F.4th 101 (2d Cir. 2023) ........................................................ 37

*United States v. Medina,*
    32 F.3d 40 (2d Cir. 1994) ............................................................ 38

*United States v. Monaco,*
    194 F.3d 381 (2d Cir. 1999) ........................................................ 31

*United States v. Mulheren,*
    938 F.2d 364 (2d Cir. 1991) ........................................................ 35

vi

*United States v. Nawaz*,
    555 F. App'x 19 (2d Cir. 2014) ............................................................ 45, 49

*United States v. Novak*,
    443 F.3d 150 (2d Cir. 2006) ...................................................................... 35

*United States v. O'Campo*,
    973 F.2d 1015 (1st Cir. 1992) ................................................................... 42

*United States v. Ojemen*,
    465 F. App'x 69 (2d Cir. 2012) ................................................................ 49

*United States v. Omar Gonzalez*,
    566 F. App'x 44 (2d Cir. 2014) ................................................................ 42

*United States v. Patterson*,
    No. 21-1678-CR, 2022 WL 17825627 (2d Cir. Dec. 21, 2022) ................ 36

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006) ...................................................................... 39

*United States v. Rattoballi*,
    452 F.3d 127 (2d Cir. 2006) ...................................................................... 45

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir. 1977) .................................................................. 30, 33

*United States v. Rossomando*,
    144 F.3d 197 (2d Cir. 1998) ........................................................... 20, 36, 43

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998) ........................................................................ 40

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987) ........................................................................ 35

*United States v. Stewart*,
    686 F.3d 156 (2d Cir. 2012) .................................................................. 46, 51

*United States v. Stitsky*,
    536 F. App'x 98 (2d Cir. 2013) ................................................................ 48

vii

*United States v. Torres,*
    604 F.3d 58 (2d Cir. 2010) ................................................ 30, 31

*United States v. Valente,*
    688 F. App'x 76 (2d Cir. 2017) ............................................. 49

*United States v. Verkhoglyad,*
    516 F.3d 122 (2d Cir. 2008) ................................................ 46

*United States v. Weaver,*
    860 F.3d 90 (2d Cir. 2017) .................................................. 35

**Statutes**

18 U.S.C. § 2 ...................................................................... 38

18 U.S.C. § 1343 ............................................................... 2, 34

18 U.S.C. § 1344 ........................................................ 2, 35, 36

18 U.S.C. § 1349 .................................................................. 2

18 U.S.C. § 3231 .................................................................. 1

18 U.S.C. § 3553(a) ........................................................ 45, 51

18 U.S.C. § 3742(a) ............................................................... 1

28 U.S.C. § 1291 .................................................................. 1

**Rules**

Fed. R. Crim. P. Rule 32 ................................................. 45, 50

**United States Sentencing Guidlines**

U.S.S.G. § 2B1.1 ............................................................ 23, 47

**Other Authorities**

DOJ, Office of the Inspector General, "Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts awarded to the University of Massachusetts Medical School," March 2022, available at https://oig.justice.gov/sites/default/files/reports/22-052.pdf .................................... 52

Pandemic Response Accountability Committee, "Review of Personnel Shortages in Federal Health Care Programs During the Covid-19 Pandemic," Sept. 2023, available at  https://www.va.gov/oig/pubs/VAOIG-22-03080-221.pdf ................... 52

Meg Anderson, "1 in 4 inmate deaths happens in the same federal prison. Why?," NPR, Sept 23, 2023, available at https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates
 ................................................................................................................................. 53

Fred Clasen-Kelly, "A federal law was meant to free sick or aging inmates. Instead, some are left to die in prison," Feb. 23, 2023, NC Newsline, available at https://ncnewsline.com/2023/02/23/a-federal-law-was-meant-to-free-sick-or-aging-inmates-instead-some-are-left-to-die-in-prison/ .................................................... 53

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

Docket No. 23-6909-cr
_____
UNITED STATES OF AMERICA,

Appellee,

-against-

VICTORIA DAVIDSON,

Defendant,

GEORGE GULDI,

Defendant- Appellant.
_____
APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

BRIEF FOR DEFENDANT-APPELLANT GEORGE GULDI
_____

## Statement of Jurisdiction

George Guldi was convicted of wire and bank fraud and conspiracy to commit wire and bank fraud, in a judgment rendered on August 1, 2023, and entered on August 4, 2023, in the United States District Court for the Southern District of New York (Hon. Alvin K. Hellerstein). A notice of appeal was timely filed on August 11, 2023. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

1

## Question Presented

1. Was the evidence insufficient to prove that George Guldi A) conspired with Victoria Davidson, who acted on her own in forging his name and lying to Ditech; B) had any fraudulent intent when he repeatedly and credibly said that he thought the money was his; or C) aided or abetted Davidson, who lied to him, in committing fraud?

2. Did the court incorrectly instruct the jury, *inter alia*, that Mr. Guldi could be guilty based on Davidson's actions *before* he had joined a conspiracy with her – even though she had no other alleged co-conspirators, and *before* he joined her fraudulent scheme?

3. Did the court err in sentencing Mr. Guldi, who was 70 years old, in treatment for prostate cancer, and struggling with a host of other serious medical conditions, to 36 months of imprisonment based on an incorrect guidelines calculation and the government's unfounded assurances that prison would provide him appropriate treatment?

## Statement of the Case

George Guldi was convicted after a jury trial of wire fraud, in violation of 18 U.S.C. § 1343, bank fraud, in violation of 18 U.S.C. § 1344, and conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349. The court sentenced him to 36 months of incarceration and three years of supervised release. He was also ordered to pay restitution in the amount of $358,566.00. Mr. Guldi is currently due to surrender to BOP custody on January 31, 2024.

2

This Court continued the appointment of the Federal Defenders of New York as counsel on appeal under the Criminal Justice Act.

## Statement of Facts

<u>Introduction</u>

George Guldi was charged with conspiracy, wire fraud, and bank fraud after Victoria Davidson, his co-defendant, lied, forged his name on an official document, and received money that Mr. Guldi thought was his. By the time he learned she had gotten this money, she had already disbursed two-thirds of it.

This started with Ditech, a company servicing the mortgage on Mr. Guldi's home, sending him a letter saying that they could not accept his payment of $253,236. They suggested he call them at a 1-800 number. Ditech, however, had not actually received the $253,236 from Mr. Guldi.

At the time Mr. Guldi received this Ditech letter, he was incarcerated. His assets, about $270,000, and been frozen by the Suffolk County District Attorney's Office. Mr. Guldi assumed that the $253,236 mentioned by Ditech was from his frozen accounts and believed that the DA's Office had sent it to prevent Mr. Guldi from recovering it if his criminal appeal was successful.

At trial, the government played dozens of prison calls between Mr. Guldi and Davidson, in which he told her about the Ditech letter, explained that he thought the

money was his and that the DA had illegally sent it to Ditech, and asked her to call Ditech for him because he was not allowed to call a 1-800 number from prison.

Later Mr. Guldi changed his mind, and he never signed an authorization letter for Davidson to speak for him. In the meantime, however, Davidson called Ditech 19 times. She lied to Ditech, sent them a forged document, and eventually convinced them to wire the $253,236 to her bank account. Mr. Guldi never spoke to Ditech.

At the end of trial, the defense moved to dismiss, arguing that the evidence was insufficient to show that Mr. Guldi conspired with Davidson, who acted on her own in talking to Ditech, or that he had any fraudulent intent, given that he believed the money was his and had not lied to receive it. The court denied this motion, claiming that, even if the evidence was "equivocal" about whether Mr. Guldi joined Davidson initially, he later "ratif[ed]" the conspiracy once she got the money, as she used much of it to pay his debts.

The court then charged the jury incorrectly that Mr. Guldi could be liable for Davidson's actions *before* he joined her criminal plan. This allowed the jury to err just as the court had erred, by essentially instructing them that they could convict him because of his reaction after she got the money, regardless of whether the government had proved Mr. Guldi entered a criminal agreement or had a fraudulent intent. This too was error.

4

Mr. Guldi, who was 70 years old and had cancer, was convicted. The court sentenced him to 36 months of incarceration.

Because the evidence was insufficient to prove Mr. Guldi's guilt beyond a reasonable doubt and the jury charge was erroneous, his convictions should be reversed and a new trial ordered. Alternatively, his sentence should be vacated because it was based on two procedural errors.

Motions in Limine

Pretrial, the defense explained that they planned to argue that Mr. Guldi was not guilty because he believed that the money Ditech sent to his co-defendant Victoria Davidson was Mr. Guldi's own money. Dkt. 103, 110, 116.[1] When he received the Ditech letter, he was incarcerated on a case prosecuted by the Suffolk County District Attorney's ("DA") office, led by Thomas Spota; the DA's office had also frozen his bank accounts. *Id.* He was waiting on the result of his appeal of that conviction, which he believed he would win. Mr. Guldi thought that the DA's office and Spota were corrupt and had sent Ditech money from Mr. Guldi's own frozen accounts to avoid Mr. Guldi recuperating it after the appeal. *Id.*

The defense sought to introduce two pieces of evidence to show these beliefs were well-founded: he won his appeal just a couple of months after receiving the

---

[1] Numbers preceded by "A" refer to pages of the appendix. Numbers preceded by "T" refer to pages of the trial transcript. All citations to the docket ("Dkt") are to ECF case number 19-cr-126.

Ditech letter, and, at the time of Mr. Guldi's trial, Spota had been convicted of corruption. A. 49; Dkt. 110 & 116, at 7-8. The court denied these requests, precluding evidence or arguments related to Mr. Guldi winning his appeal or corruption within the Suffolk County DA's Office. A. 50; Dkt 127.

Trial

In 2008, George Guldi's home in Suffolk County, New York burned down. A. 110; GX 1101. His insurance company sent him a check for $863,473.30 that he was required to use to either rebuild the house or pay his mortgage. A. 110; GX 1101. When he used the money for something else, he was convicted of grand larceny and went to prison. A. 110. The Suffolk County DA's Office froze his bank accounts. A. 110. These accounts had $270,924.02 in total. A. 110.

In 2014, Countrywide Home Loans and Bank of America sued JP Morgan Chase Bank for sending Mr. Guldi the fire insurance money. A. 111; GX 1103. In 2017, the banks settled, and Chase Bank sent $253,236 to Ditech, a company servicing Mr. Guldi's mortgage on the burned-down home. A. 111. The settlement stated that Chase will "make reasonable, diligent efforts" to "obtain an order directing the release" of Mr. Guldi's money in the amount of $221,764. A. 189; GX 132. It further stated that the DA's Office has "indicated a willingness to move the Court for an order releasing these funds to" Ditech and other banks. GX 132. Mr. Guldi was not a

6

party to this confidential settlement. GX 132, 1103. Ditech treated the settlement money as a payment by Mr. Guldi towards his mortgage. A. 111; GX 1103.

Ditech then sent Mr. Guldi a letter at his correctional institution, which stated that it had "received [his] payment in the amount of $253,236.00 on 3/15/2017." GX 130. The letter said that the payment was "being held and was not credited because the payment is not sufficient," adding that the "amount received was either a partial payment or not enough to cure the default" and that the "amount needed to bring [the] account current is $1,168,362.23." GX 130.[2] The letter instructed Mr. Guldi to "contact [Ditech] at 1-800-643-0202…for other arrangements." GX 130.

People who are incarcerated, as Mr. Guldi was when he received this letter, cannot call 1-800 numbers. A. 100. There was no record of Ditech ever contacting Mr. Guldi about his mortgage before this letter. A. 147.

---

[2] A former Ditech employee explained that, when a home is in foreclosure, the account holder can pay a particular amount to reinstate the mortgage. A. 153. If, however, the account holder pays less than that amount, Ditech would not accept the money and would continue with the foreclosure sale. A. 153. A Ditech paralegal, however, said that the settlement money should have been applied to the principal of Mr. Guldi's mortgage. A. 191; GX 1117.

<u>Mr. Guldi told Davidson to call Ditech and ask who sent the money, which he believed the District Attorney had illegally moved from his accounts.</u>

On March 28, 2017, Mr. Guldi received the Ditech letter and called Victoria Davidson, his former-romantic partner. GX 204; A. 290. In a recorded jail call,[3] Mr. Guldi read her the letter, and said that he "[knew] exactly what this is," and that it is the "money that the DA seized, minus what they've looted." *Id.* Mr. Guldi explained to Davidson that the DA had been allowed to "seize [his] money." *Id.* He had not heard about any court allowing the DA to use his money to "make a payment," so he "suspect[ed] the invisible hand of the DA" had sent the money to Ditech.[4] *Id.*

He had been working on the appeal of his conviction and said that the DA, "knowing…the status of my appeal, and that this money is mine, has directed Chase, without benefit of a court order, to make a payment to the – to these people, so they can deprive me of the money." *Id.* He added, "It's illegal." *Id.* He added that "they" "know" that "I can't even talk to the bank" when they "gave me an 800 number to

---

[3] At trial, the government introduced approximately 28 recorded jail calls from Mr. Guldi from March 13 through May 19, 2017. GX 201, 204-07, 209, 211-223, 224-32, 235, 237-38; GX 1001, 1002, 1006 (summary timelines of all calls). In introducing these calls, the jury heard repeatedly that Mr. Guldi was "an inmate" at a "New York State Correctional Facility."

The government produced transcripts of these exhibits as aids to the jury, but the transcripts were not admitted into evidence. For convenience, however, citations here refer to the transcript page numbers. The calls and the transcripts are available on an audio CD provided to the Court with this brief.

[4] This belief turned out to be wrong: his bank accounts remained frozen in 2017. A. 194.

call." *Id.* He told Davidson that "if you want to tackle this, and we manage to get – break it loose, I'll give you ten percent." *Id.*

Mr. Guldi "suspect[ed]" it was a "trap," but gave Davidson the information in the Ditech letter, so that she could "do what [she] want[s] with it." GX 204; A. 291. He told her to ask Ditech, "where did you get this money" and "[w]ho sent you this money." GX 204; A. 292. He cited New York Real Property Law, and said that the money should have been "put in trust for" him. *Id.* Davidson asked if she should tell Ditech that, and he said that she could "do whatever" she wanted and "use [that information] as you will." *Id.*

Davidson suggested asking Ditech to send the money to her, but Mr. Guldi said "that's not gonna work." *Id.* He added that she could "take a harder line with them" and "go with what works." *Id.* He reiterated that the money should be "refunded to" his account, or he would get a lawyer to "put it in escrow." *Id.* Mr. Guldi told her that Ditech might "need something in writing from" him. *Id.*

Davidson next suggested that, instead, she should tell Ditech that it "was a mistake, oops, okay…oops, we thought it would be enough to just kind of hold things over, all right, send it back." GX 204; A. 295. Mr. Guldi said "no." *Id.* He told her to say that the money "shouldn't have been sent to you," to ask, "who sent it to you, how did you get this money," and to say, "this is not authorized by me." *Id.*

9

When Davidson pointed out that Ditech would send it back to the "people who sent it," Mr. Guldi replied that they "have to" and that he would have a "better chance getting it" afterward. *Id.* Davidson, however, said that that she "want[ed] the money" and offered various suggestions how she could get it herself. *Id.* Mr. Guldi laughed repeatedly at these suggestions, indicating he thought that her ideas were ridiculous. *Id.*

> <u>Mr. Guldi reiterated his belief that the DA gave Mr. Guldi's money to Ditech and again told Davidson she should ask Ditech who made the payment.</u>

The next day, March 29, Mr. Guldi reiterated to Davidson that he thought the DA was "involved," saying that they had "dumped" his money "illegally to a bank," which is a "clear indictor they know they're losing their appeal and soon." GX 206; A. 104, 300. Mr. Guldi added that the DA wanted to "tie [his money] up" with the mortgage. GX 206; A. 300. Mr. Guldi explained that, if he won his appeal, he would get his money back. *Id.* By the DA sending the money to Ditech, the DA could "continue to deprive" him of it. *Id.* Mr. Guldi again advised Davidson to ask Ditech, "where did you get this money, who made this payment." GX 206; A. 301.

Also on March 29, Mr. Guldi read the letter from Ditech to a friend named Dan. GX 205; A. 296. Mr. Guldi told Dan that he "recognize[d] the amount" as the "amount of seized money in" Mr. Guldi's frozen bank accounts. *Id.* He said that the money, therefore, "isn't the bank's" "unless they got it without notice to me." *Id.* Just

10

like he said to Davidson, Mr. Guldi explained to Dan, that he viewed it as "clearly a DA inspired [ ] effort to put that money someplace where I can't get it, because they know they're gonna lose the appeal." *Id.* He added, "the whole thing stinks to high heaven." *Id.*

> <u>Mr. Guldi told Davidson that he was not ready to authorize her to speak to Ditech on his behalf.</u>

In a second call on March 29, Davidson told Mr. Guldi that Ditech said that she needed an authorization letter from Mr. Guldi for Davidson to act as his agent. GX 207; A. 302. Six days later, Mr. Guldi had not yet sent her an authorization letter. GX 209. On April 5, he told her he had "not finished" the letter and that he thought he needed "a lawyer" to handle the Ditech matter. GX 209; A. 307. He said he would "talk to [her]" once he "focused on" it. GX 209; A. 308. Davidson was in particularly dire financial straits, and had earlier told Mr. Guldi that she was "broke" and "desperate" and close to "homeless." GX 202. During the call on April 5, she tried to pressure him to write the letter, saying she was "dying here," and that he "ha[d] to give [her] permission to speak to them." GX 209; A. 308. Mr. Guldi brushed her off, saying he had "other things" to do and would "focus on that … when I get to it." *Id.* At the end of the call, she pushed again, saying "no, no, no, no, can you not think through it, can you just send the letter?" GX 209; A. 312. Mr. Guldi reiterated that he had to "think through it." *Id.*

11

After this call, Mr. Guldi did not talk to her for about 10 days. During that time, however, Davidson was busy; she called Ditech about 12 times. GX 1006.

> Unbeknownst to Mr. Guldi, who never gave written authorization to Davidson to speak on his behalf, Davidson called Ditech 19 times, lying repeatedly.

Mr. Guldi never signed an authorization for Davidson to speak on his behalf. A. 242. Davidson, however, faxed Ditech a forged letter, purported to be signed by Mr. Guldi, giving Davidson authorization to "manage the return of this payment made in error" and to "wire the full amount" to "her attention" with bank account numbers. GX 126; A. 114.[5] The signature on this letter looked nothing like Mr. Guldi's actual signature and his typed name was misspelled "Guld." *Compare* GX 126 *with* GX 302-03; A. 193. A Ditech customer service representative testified that the letter looked "suspicious" because she "couldn't really read" the name in the signature, and it "look[ed] incorrect." A. 127. Ditech did nothing to confirm with Mr. Guldi that the authorization was accurate. A. 126, 146.

Despite these problems, a Ditech employee decided the letter was sufficient, and Ditech representatives started working with Davidson. A. 152. In 19 calls with Ditech, Davidson inaccurately called herself Mr. Guldi's "officer," a "lawyer," and said that "she and the account holder sent in the money by mistake" or "accidently." A 139, 151; GX 101-119. Davidson asked Ditech "if [she could] get [the] check made

---

[5] The area code "860" on the fax was from Connecticut, where Davidson lived, not New York, where Mr. Guldi was incarcerated. *See* GX 126; A. 126; https://www.allareacodes.com/860.

out to her since [Mr. Guldi] is incarcerated," and was told that she needed to get a power of attorney signed by Mr. Guldi. A. 130, 142.

Meanwhile, not only did Mr. Guldi not know that Davidson was calling Ditech and lying that Mr. Guldi had given her written authorization to speak to them, but he also changed his mind about Davidson speaking for him at all: in two calls on April 14, Mr. Guldi told Davidson he did not want her to be his representative. GX 211-12.

<u>Davidson lied about sending Ditech a power of attorney from Mr. Guldi, which Mr. Guldi did not complete until after Davidson got the money.</u>

Davidson visited Mr. Guldi in person on April 16, 2017. A. 105. In calls afterward, they discussed Mr. Guldi's plan to fill out a notarized power of attorney form. GX 213; A. 314. He told her that he would give her 20% of the money if they were able to recover it, *id.*, in exchange for her making the phone calls and paying bills for him. GX 214-16; A. 319.

Again, however, Mr. Guldi failed to quickly fill out the forms Davidson requested. Instead, they continued to discuss Mr. Guldi's lack of progress with the notary forms over the next few days. GX 214; A. 319-20.

Davidson only spoke to Ditech four times after visiting Mr. Guldi, twice on April 19 and twice on April 20. GX 116-119. In these calls, she checked on the status of the money and lied that she had "taken care of [the] power of attorney." A. 142. Mr. Guldi had not sent Davidson a power of attorney and there was no record of Ditech ever receiving a power of attorney. A. 130, 149.

13

<u>Davidson repeatedly lied to Mr. Guldi, telling him she had not received the money, when she had.</u>

On April 20, Ditech sent a write transfer of $253,326 to Davidson's bank account. GX 1109; A. 143. That evening, she spoke to Mr. Guldi and said she had <u>not</u> received the money, but apparently referring to the money, speculated about how many "slices" of "birthday cake" she would get. GX 217; A. 336. She lied to Mr. Guldi, saying that Ditech told her that a check was "in the mail." GX 217; A. 331.

She repeated that lie the next day: On April 21, she again told Mr. Guldi that she did not have the money. GX 218. She elaborated, saying that she did not "entirely believe" Ditech that the check was coming. GX 218; A. 339. That same day, Mr. Guldi finally signed a power of attorney. DX A.

Davidson lied to him again on April 23 and April 26. In these calls, Mr. Guldi continued to update her about his progress in completing the power of attorney, explaining that he had gotten the form notarized and had "start[ed]" to put it in an envelope. GX 219-20; A. 345. On neither day did Davidson tell him that the money had been wired to her account. Instead, Davidson said that Ditech was giving her the "runaround." GX 220; A. 349.

By this point, Davidson had the money already for almost a full week; she had already withdrawn close to $170,000. GX 403 & 1003. On April 26, only approximately $83,000 remained in her account. GX 403.

14

<u>By the time Davidson told Mr. Guldi she had received the money, 11 days afterward, she had already gotten a "battery of bank checks."</u>

It was not until the evening of May 1, that Davidson told Mr. Guldi that she had gotten the money from Ditech. GX 221. Mr. Guldi told her that "wires can be reversed," and Davidson replied, "I think it's too late for that, because I went…streaming ahead and got all your checks," adding that she had already "got[ten] a battery of bank checks." GX 221; A. 350. Mr. Guldi said that she "might want to" have "some of it" in cash, but that she should "never take ten at a time, you take nine, because there's additional reporting" "requirements on ten." GX 221; A. 354. Mr. Guldi said that she should "[r]oll" the rest of the money into "bank checks." *Id.*

Mr. Guldi asked her to document all transactions, requesting photocopies of the receipts. GX 221; A. 351. He also discussed the tax consequences, explaining that he would not have to pay taxes on the money because it was his money and he had "already been taxed on it." GX 221; A. 354. He advised, however, that Davidson should speak to an accountant about the tax consequences for her. *Id.* Davidson – the only one who knew the lies she told Ditech to get the money – replied that she felt like she "should stay under the radar." *Id.* Mr. Guldi replied that would be hard for her to do because the money was in "[her] account." *Id.*

Mr. Guldi also questioned Davidson, asking why she did not "even need the paperwork" from him to get the money from Ditech. *Id.* She explained, it was "extraordinary," and that they "just wired it to me" because Ditech knew she was

15

"pissed" and that they had "fucked up." *Id.* On May 2, Mr. Guldi told Dan that Davidson had gotten the money before he could "even get" another friend "to make a phone call about it." GX 224; A. 357. He told Dan to come visit if he wanted to talk about it in detail. *Id.*

> ### In subsequent calls, Davidson and Mr. Guldi disagreed as Davidson resisted Mr. Guldi's requests that she use the money to pay off Mr. Guldi's debts.

In calls through May, Mr. Guldi and Davidson disagreed about how to spend the money, with Mr. Guldi asking her to pay his debts and send him money for his prison commissary account. GX 224, 227-232, 235, 237-38. Mr. Guldi said that he felt he was getting the "runaround that [he] always [got] from people who are controlling my money for me…and not doing what I want and need." GX 230; A. 364. He told her it was not okay" for her to "decide what account [his] money is in." GX 230; A. 366. Davidson told him that she "never did anything without your permission" but "was just trying to be efficient." GX 229; A. 359.

In the final call introduced by the government, Mr. Guldi "speculate[d]" about how Ditech had gotten the money when he had "never authorized it." GX 238; A. 368. Seemingly referring to the DA's office, he said, "[t]hey would freak" if they realized the money was no longer with Ditech. *Id.*

<u>Davidson had already converted over $140,000 into cashier's checks before she even told Mr. Guldi she had the money.</u>

On April 13, Davidson's bank balance was negative $115. A. 196. On April 20, the balance was $252,699. A. 196. Davidson started using this money on April 21, the day after she received it, withdrawing $158,441.06 from her account, including $140,215 in cashier's checks. GX 403 & 1003. The cashier's checks were made out to towns where Mr. Guldi owed property and to Davidson's student loan account. GX 1003. By May 1 – when she first told Mr. Guldi she had received the money – she only had $69,690.13 remaining in her account. GX 403, p. 8. By July 13, her balance was negative again. A. 196. Mr. Guldi never had access to Davidson's bank account. A. 211.

After telling Mr. Guldi that she had received the money, she paid his New York state child support using a cashier's check in the amount of $10,000. GX 1003. The same day she had a cashier's check made out to herself for approximately $49,000. GX 1003. She later used part of that cashier's check to purchase another cashier's check to pay a $12,423 debt of Mr. Guldi. GX 1004. The government never introduced evidence suggesting that she withdrew cash in amounts designed to be under $10,000. On the contrary, the non-check purchases highlighted by the government were related to her trip to Italy and horseback riding supplies. A. 199.

The bank maintained a record of all of Davidson's cashier's checks, each of which had her name at the top and a serial number. A. 207-09. Davidson personally

went into the bank to receive the checks. A. 207-08. Nothing was hidden; everything appeared on her banking statements. A. 209.

<u>Motion to Dismiss</u>

At the close of the evidence, the defense moved to dismiss, arguing that the evidence was insufficient for each count and specifically arguing that there was insufficient evidence that Mr. Guldi participated in the conspiracy or had a fraudulent intent. A. 219. On the contrary, Mr. Guldi "unequivocally" "believed that the money sent to Ditech…was his." A. 219. That he believed in "good faith" that the money belonged to him was "unrefuted" and meant he did not have the intent to commit a crime. A. 219. There was "no agreement" between Mr. Guldi and Davidson and he never asked Davidson to lie, scheme, or do anything illegal. A. 219.

Instead, Davidson lied to Ditech without Mr. Guldi knowing about it or agreeing to it. A. 219. Mr. Guldi stalled, telling her he hadn't sent her any authorization, but was "working on it." A. 219. Then he said that Davidson had "talked [him] out of" her acting as his representative. A. 219. What he didn't know, was, while Mr. Guldi thought he was stalling, Davidson had already forged Mr. Guldi's signature on an authorization letter to Ditech. A. 219.

The court noted that Mr. Guldi had only told Davidson that he "would" or "might" give her authorization. A. 220. The court, however, stated that, even if the "evidence is somewhat equivocal on advance authority," the evidence was "full on

18

ratification. He was very glad she got the money." A. 220. In the court's view, Mr. Guldi was "very happy to distribute the money," so he "made great [ ] use of what Davidson had done, thus identifying himself in the conspiracy." A. 220.

The defense said that the court was wrong because Mr. Guldi could not be guilty of a conspiracy that he did not join or know about. A. 220. As the defense noted, Davidson received the money on April 20 and started spending it, without telling Mr. Guldi. A. 220. When she did tell him she had the money, Mr. Guldi did seem "happy" but he "also sound[ed] incredibly concerned," and then got mad at her about how she was spending the money. A. 220. That showed that he "believe[d] it [was] his money, that he [was] entitled to it." A. 220.

The court denied the defense motion without further explanation. A. 220.

<u>Charge conference, jury instructions, and verdict.</u>

During the charge conference, the defense requested that the court instruct the jury that, for Mr. Guldi to be liable, Davidson's actions must have been "reasonably foreseeable" to him. A. 232. The government replied, that was "just demonstrably not the law…once they join a conspiracy, [they] are responsible for all acts of other conspirators in furtherance, even acts of which they have no knowledge." A. 232. The court rejected the defense request. A. 233.

In its jury charge, the court stated that "A coconspirator's liability is not measured by the extent or duration of his or her participation or whether he or she

19

joined at the outset or some later time." A. 273. The court added that "[s]ometimes a single act may be enough to bring a defendant within the membership of a conspiracy, provided that defendant was aware of the conspiracy and knowingly associated himself with its criminal purposes." A. 273.

The defense also objected to a charge that the "government need not prove that the deceived person actually was harmed, nor is it relevant if the defendant thought that the money or property really belonged to him or her, or should be paid to him or her, or that the motives were good." A. 229. The defense requested that sentence be "removed entirely," or, in the alternative, that the court substitute the word "dispositive" for "relevant." A. 229. The court denied these requests and provided the charge, unchanged, to the jury. A. 229, 275.

The defense requested that the court instruct the jury that "[b]ecause an essential element of the crime charged is an intent to defraud, the defendant's good faith is a complete defense to the charge," citing *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998). A. 229-30. The court denied this request as well, saying that "[g]ood faith is a modifier of truth. It's not a modifier of motive. And what you're trying to do is to conflate the two." A. 230. It instead charged that "[i]f the defendant had a good-faith belief that his or her words and actions were truthful and honest, you must acquit that defendant." A. 275-76.

20

The court also overruled the defense objection that a portion of the wire fraud charge was "vague" and "confusing." A. 229. The objected to charge was provided to the jury:

> A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally acts in a way to further the unlawful goals or makes the goals his own, becomes a member of the scheme and is legally responsible for that all that may have been done in the past in furtherance of the criminal objective. A. 275.

After deliberations, including sending the court two notes, the jury found Mr. Guldi and Davidson guilty of all counts. T. 874-75.

Sentencing

Mr. Guldi was 70 years old at the time of sentencing. PSR 18. He had grown up as one of seven children in a working class family in Westhampton Beach, New York. PSR 16-17. His father was an alcoholic; young George and his brother would have to "go to the bars in town, find Dad and bring him home." PSR 17; Dkt. 184. His mother was physically and verbally abusive; she once chased the children with a meat cleaver, "hack[ing] a two-by-two foot hole" in their bedroom door. PSR 17; Dkt. 184. His sister described the siblings coping by "laugh[ing]" and making jokes to "soften the pain and fear." *Id.* Mr. Guldi started working himself when he was just 10 years old. PSR 17.

21

Despite this upbringing, for a time, Mr. Guldi was successful. In 1978, Mr. Guldi graduated from Fordham University law school and started working as a general practice lawyer. PSR 20, 22. From 1994 to 2003, he served as a Suffolk County legislator, fighting against corruption, instituting housing reforms, and protecting parks. PSR 22, Dkt. 184. Mr. Guldi also married twice and had five children.

His life began to unravel in 2008, when his home burned down. *Id.* He was subsequently charged with mortgage and insurance fraud and lost his law license. *Id.* Mr. Guldi took a pro se, *Alford* plea, continuing to state he was innocent, while pleading guilty to a scheme to defraud mortgage lenders. PSR 12. He was also convicted of grand larceny after a jury trial, which was overturned in July 2017. PSR 12. On remand, he pleaded guilty to the same charge and was sentenced to time served. PSR 14. In total, he had served over seven years in prison on both cases. PSR 12. While there, he was assaulted multiple times, lost 10 teeth, and developed PTSD. Dkt. 184.

After his release from prison, he rebuilt his relationship with his family, including his 19 year old autistic son, who cannot live independently, and worked as a tow truck driver in Vermont. PSR 16-17, 21-22. His sister described him as "as so good with his [autistic] son, patient and helpful." Dkt. 184. His ex-wife called Mr. Guldi "generous and helpful," with a "sense of humor." PSR 17.

22

At the time of sentencing, Mr. Guldi had a host of documented medical conditions, including prostate cancer, diabetes, arthritis, hyperlipidemia, hearing loss, sleep apnea, obesity, and numerous problems in his lumbar region (sciatica, radiculopathy and degeneration). PSR 18-19. He was also prescribed medication for weakness, numbness, and loss of muscle coordination. PSR 19. He was missing 23 teeth. PSR 19. Since the 1990s, he had received mental health treatment, including for depression, PTSD, and anxiety. PSR 19.

In a written submission, the defense argued that the "BOP cannot provide adequate medical care to high-needs" people like Mr. Guldi. Dkt. 184, citing DOJ Inspector General reports. In response, the government noted Mr. Guldi's "age, health conditions and the medical care he expects in Federal" custody, and said that the court "can and should take these factors into account." Dkt. 186 at 14. The government added that "these factors may counsel [in] favor of less time in prison" but that "they did not justify *no* time in prison." *Id.*

### Guidelines calculation and objection to enhancement for using sophisticated means.

The PSR calculated Mr. Guldi's offense level to be 21, including a two-level enhancement for use of sophisticated means, under U.S.S.G. § 2B1.1(b)(10)(C). PSR 11. The defense objected to this enhancement. PSR 33; Dkt. 184. The PSR asserted that it applied because Davidson submitted a forged letter to Ditech, communicated false information to Ditech, and purchased cashier's checks with the money. PSR 11.

23

The government also argued it was appropriate because Mr. Guldi "instructed Davidson how 'to avoid bank reporting requirements and make it more difficult to trace the stolen funds" and that using cashier's checks "prevent[ed] Ditech from clawing bank the funds and reduc[ed] the paper trail associated with the scheme." Dkt. 186; PSR 33.

At sentencing, the court summarized the parties' written positions about the sophisticated means enhancement, stating that the defense argued it "wasn't at all sophisticated, it was just a con game," and that the government argued that "playing bank rules off one against the other and breaking the check in various amounts and setting up [ ] Davidson to pretend that she could have access to the account" was sophisticated. A. 377-78. The court applied the enhancement without further comment. A. 378.

The court found the criminal history category to be III and the offense level to be 21 for a guideline range of 46-57 months. A. 379. Probation and the government each recommended a sentence of 36 months of imprisonment. PSR 38; Dkt. 186.

<u>Sentencing proceeding</u>

The defense noted that, before trial, the government "offer[ed] Mr. Guldi a [plea to a] misdemeanor" with a maximum prison sentence of 12 months. A. 397. Mr. Guldi had been on pretrial release for five years, from 2018 through to 2023, and his good conduct demonstrated that he was deterred. A. 398; Dkt. 184. Until recently,

24

when he had to retire due to pain, he had been working as a tow truck operator and was completely unassociated with his prior life. A. 393, 398.

The defense highlighted Mr. Guldi's advancing age and poor health, noting in particular that he was currently undergoing radiation to treat prostate cancer. A. 393. Mr. Guldi was under the care of seven different medical specialists for his medical conditions. A. 400. To assist his mental health, he had a therapy dog, Noodle, who was present in defense counsel's office during the trial, so Mr. Guldi could see him during breaks. A. 394. The defense requested a non-incarceratory sentence.

The court asked the defense where he was receiving his radiation and chemotherapy treatment, and then asked the government if "imprisonment [was] consistent with letting Mr. Guldi continue his radiation therapy and his chemotherapy." A. 394-95. The government claimed it was. A. 395. The court said that "[m]odern radiation is a highly focused type of treatment and the chemotherapy needs constant adjustment, and it's very hard to have a confined person be running back and forth to get these treatments." A. 395. The government declared that "BOP has medical facilities," which "would be, it sounds like, appropriate here for Mr. Guldi." A. 395-96. The court asked the defense when his "chemotherapy [was] supposed to end?" A. 396. The defense replied that was unknown, as he "currently has prostate cancer," which is "not in remission." A. 396. The court said that "[l]ots of people have prostate cancer and die of something else." A. 396. The defense

25

agreed, noting that Mr. Guldi had a "host" of "health problems," not just cancer, which would make his "incarceration" "incredibly dangerous." A. 396.

The court replied that "Mr. Guldi deserves a time in confinement," noting that he was an "intelligent man," who had graduated from a top law school and had a flourishing career, and that the "crime was a very serious one." A. 397. The court said that when Mr. Guldi ran into financial difficulty he committed financial crimes "one after the other." A. 397. The court said that the "only factor that is a great concern of mine is the medical condition," "[s]pecifically, it's the chemotherapy and the radiation." A. 398. The defense agreed, and said that the BOP is a "total mess," noting that judges had been "publicly" "highly critical of their ability to provide medical care." A. 400-01.

The government replied that the judicial criticisms were "directed toward the MDC," but Mr. Guldi would be "designated to a BOP facility or a medical facility." A. 401. The judge added that the "primary medical facility is in North Carolina." A. 401. The defense replied that "Butner," the medical facility in North Carolina, was "being sued for lack of care," and that conditions were "horrific." A. 401-02.

Mr. Guldi spoke, saying that it was "incredibly painful" to listen to the recorded phone calls and hear what a "fool" he was. A. 403. He regretted not "following [his] instinct to find a lawyer," but as he put it: "frankly, I had been years in jail, I had no records, no access and every lawyer I knew from my prior career was treating me like

a pariah." A. 403. When told by the court that he got "money that was not yours," he said that he "thought it was mine. I was mistaken." A. 404. He was "truly contrite." A. 407.

At sentencing, he was wearing diapers, as he was incontinent due to his prostate cancer. A. 406-07. Some days, he could not leave the house. A. 406-07. His arthritis sometimes felt paralyzing; he would be sitting and "suddenly feel like somebody just hammered a knuckle [or] my wrist, and [his] hands will be locked up and powerless." A. 407. He told the court that the "prospect of taking that array of disabilities to a correctional facility is daunting" and that he was "seeking mercy from the Court." A. 407. He "fear[ed] [a lengthy prison term] would be a death sentence." A. 407.

After Mr. Guldi's remarks, the government stated that there was a "BOP medical facility in Massachusetts," called Devens. A. 408. The defense replied that it was "possible that [that facility] might provide better care than Butner" but that it was "very difficult" to "get into." A. 410.

The court said that he saw the crime as "serious," noting that Mr. Guldi "took money that didn't belong" to him, adding that "whether [he] fooled [him]self to think that it was really [his], it wasn't." A. 410. The court noted that the "great appeal that he [had] [was] that [he had] medical problems that compound[ed] [his] age," but said that the "nature of the crime and the deterrence needed to persuade others not to

commit such crimes and to make sure that you again are not tempted to do so is necessary." A. 411. The court sentenced Mr. Guldi to 36 months of custody followed by three years of supervised release and restitution. A. 411. The court recommended that Mr. Guldi be designated to FMC Devens, noting that he was in "need of radiation therapy" and "chemotherapy, both of which are very delicate and need to be continually balanced," saying that defense counsel said that "Devens is the best place to get that." A. 411. Mr. Guldi was subsequently designated to FMC Butner. Dkt. 207.

Davidson was sentenced to only nine months in custody. Dkt Entry 10-4-23.

## Summary of Argument

Mr. Guldi and Davidson did not agree to lie to Ditech and Mr. Guldi never wavered in his belief the Ditech money was his own. The government, therefore, did not prove beyond a reasonable doubt that Mr. Guldi reached an agreement with Davidson to commit fraud, had any fraudulent intent, or aided or abetted Davidson in committing fraud. Instead, the evidence was insufficient and his convictions should be reversed.

Additionally, the court instructed the jury that they could convict Mr. Guldi based on Davidson's actions *before* Mr. Guldi joined her conspiracy and *before* he joined her fraudulent scheme. These charges were wrong. While a late-joiner to a conspiracy can be liable for earlier actions of co-conspirators, here, there were only two alleged co-conspirators, Mr. Guldi and Davidson. Thus, Mr. Guldi could not have joined the

28

conspiracy late; there was no conspiracy without Mr. Guldi. Moreover, for substantive offenses, people are not liable for the actions of others before they joined the scheme. These charging errors require that Mr. Guldi's convictions be reversed and a new trial ordered.

In the alternative, this Court should order that Mr. Guldi's sentence be vacated because his guidelines were calculated incorrectly and the court relied on the government's unsupported assurance that the Bureau of Prisons could properly handle Mr. Guldi's cancer treatments without proper fact-finding.

## Argument

### Point I

**The evidence was insufficient to prove that George Guldi A) conspired with Victoria Davidson, who acted on her own in forging his name and lying to Ditech; B) had any fraudulent intent when he repeatedly and credibly said that he thought the money was his; or C) aided or abetted Davidson, who lied to him, in committing fraud.**

A.    Standard of review

This Court reviews challenges to the sufficiency of the evidence *de novo*. *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir. 1997). "A defendant challenging the sufficiency of the evidence bears a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States v. Kozeny*, 667 F.3d 122,

139 (2d Cir. 2011). This Court must enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager" that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Nonetheless, Mr. Guldi's burden is "not an impossible one." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004). If the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). The "jury's inferences must be reasonably based on evidence presented at trial, not on speculation," and "specious inferences are not indulged." *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (internal quotation marks and citations omitted).

> **B.** <u>The government did not prove beyond a reasonable doubt that Mr. Guldi agreed with Davidson to commit any crime.</u>

A conspiracy is an "agreement among the conspirators," requiring a "meeting of minds." *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977). To sustain a conspiracy conviction, "the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and

30

participated in it." *United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008) (citation omitted). The government must also prove that the defendant possessed "the specific intent to commit the offenses that were the objects of the conspiracy," which requires the government to prove "at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999); *Torres*, 604 F.3d at 65 (citation omitted).

Here, the evidence of any criminal agreement was lacking. On the contrary, Mr. Guldi told Davidson about the Ditech letter and explained that he thought the money was his own because he believed that the DA's office had illegally moved his money. GX 204. When Davidson said that Ditech would likely send the money back to the "people who sent it," rather than Mr. Guldi, Mr. Guldi said that was "better" and he could then get his money from those people. *Id.* That his belief was firmly held was supported by his suggestions to Davidson that she should ask Ditech where the money came from. *Id.* She did not ask Ditech these questions, but he did not know that. They never reached an agreement.

In subsequent calls, Davidson asked Mr. Guldi to sign paperwork authorizing her to speak to Ditech; he said no. There was still no agreement. Instead, on her own, Davidson forged Mr. Guldi's signature on the document he declined to sign. There was no evidence Mr. Guldi knew this. On the contrary, the evidence suggested strongly that he didn't: *after* Davidson had forged his name, Mr. Guldi told her she

31

should not act as his representative, saying that he needed more time to "focus" on the Ditech matter. GX 209. Despite this, Davidson continued speaking to Ditech purportedly on his behalf, calling them 12 times after Mr. Guldi told her she should not act as his representative. GX 1006.

This remained true after Davidson got the money. Rather than tell Mr. Guldi she had the money, she lied. By the time she told him about it, she had already spent two-thirds of it. And, when Mr. Guldi asked her how she obtained the money without his paperwork, she said that it was "extraordinary" and that they "just wired it to me" because Ditech knew she was "pissed" and that they had "fucked up." GX 221. Even then, with the money in hand, Davidson did not tell Mr. Guldi the truth: that she had forged paperwork in his name. There continued to be no agreement.

The government, however, pointed to the fact that Davidson visited Mr. Guldi once, on April 16, in the only conversation that was not recorded, and that, afterward, Mr. Guldi started talking about giving her a power of attorney. But this was far short of sufficient evidence to show that Mr. Guldi entered into a conspiracy with her. On the contrary, after April 16, Mr. Guldi remained focused on legitimate, legal documents, saying he would draft a power of attorney, and explaining his difficulties in getting an appointment with the prison notary. GX 214. This only further supported that Mr. Guldi did not know that Davidson had already forged a document with his signature. If he knew about the forgery and was agreeing with her to continue

32

a fraud, he would not have spent days getting a notarized document signed in prison. Indeed, doing so would have made the original forgery easier to uncover by providing a real version of his signature. That he continued working on these real, legitimate forms for Davidson after she had already successfully convinced Ditech to send *her* the money, only supports that he did not know what Davidson had done.

The court did not appear to disagree, saying that it was "somewhat equivocal," whether Mr. Guldi joined a conspiracy before Davidson got the money. A. 220. But it denied the motion to dismiss because Mr. Guldi "ratif[ed]" the conspiracy afterward. A. 220. This too was wrong. First, there were only two alleged coconspirators. "(U)nless at least two people commit (the act of agreeing), no one does." *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977). *See also Ocasio v. United States*, 578 U.S. 282, 287–88 (2016)("Conspiracy, in the modern law, is generally defined as a confederacy of two or more persons to accomplish some unlawful purpose") (citation omitted); *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998) ("As a matter of law, the crime of conspiracy must involve the agreement of two or more persons to commit a criminal act or acts "[s]ince the act of agreeing is a group act, unless at least two people commit it, no one does."). Given the lack of evidence Mr. Guldi ever agreed with Davidson, there simply was no conspiracy for him to ratify later.

Second, Mr. Guldi did not join a conspiracy with Davidson <u>after</u> she got the money. On the contrary, nothing about Mr. Guldi's statements when Davidson did

33

tell him she got the money suggested that he was part of a conspiracy. He didn't do or say anything indicating he believed she had committed a crime. On the contrary, he asked her to document the transactions and mail him receipts. GX 221. He told her she would need an accountant to talk through the tax consequences, and he said that her wish to stay under the "radar" was unrealistic. *Id.* While he recommended that she use cashier's checks because wires could be "reversed," that was not inconsistent with his belief that the corrupt DA's office might try to repossess the money if they learned about it. It was consistent with his unwavering belief that the money was his. Similarly, his complaints to Davidson about how she was handling *his* money also bolstered this interpretation. GX 230.

There was simply insufficient evidence that Mr. Guldi joined a conspiracy with Davidson. His conviction, therefore, should be reversed.

C.     <u>The evidence was insufficient to show that Mr. Guldi had a fraudulent intent.</u>

The federal wire fraud statute penalizes using a wire communication to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. Thus, the "essential elements" of the crime are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). The federal bank fraud statute penalizes schemes to "to defraud a financial institution," 18 U.S.C. §

1344(1), and schemes "to obtain any of the moneys… owned by…a financial institution, by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1344(2).

For both wire and bank fraud, the government must prove that the defendant had a fraudulent intent. *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent)); *United States v. Chandler*, 98 F.3d 711, 715 (2d Cir. 1996) (Since the "bank fraud statute was modelled after the mail and wire fraud statutes, precedents interpreting those statutes are helpful in interpreting the bank fraud statute."). *See also United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (fraudulent intent means that the "defendant's conduct was calculated to deceive") (quotation and citation omitted). "Fraudulent intent may be inferred "[w]hen the 'necessary result' of the actor's scheme is to injure others." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021). "[F]raudulent intent cannot be inferred from evidence 'at least as consistent with innocence as with guilt.'" *United States v. D'Amato*, 39 F.3d 1249, 1259–60 (2d Cir. 1994) (citing *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991).

The intent to deceive must also include an intent to harm or an intent to take "bank property": "intent to deceive alone is insufficient to sustain a wire fraud conviction, "[m]isrepresentations amounting only to a deceit ... must be coupled with

35

a contemplated harm to the victim." *Jabar*, 19 F.4th at 76; *Id.* at 81 (emphasizing "that intent to defraud, an essential element of wire fraud, includes *contemplated* harm"); *United States v. Chacko,* 169 F.3d 140, 148 (2d Cir. 1999) ("Intent to harm is an essential element in proving bank fraud under 18 U.S.C. § 1344" subsection one); *United States v. Patterson*, No. 21-1678-CR, 2022 WL 17825627, at *2 (2d Cir. Dec. 21, 2022) (bank fraud under section 1344 (2) requires "an intent to take bank property"). This fraudulent intent includes a showing "that some actual harm or injury was contemplated by the schemer." *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) (citation omitted). It is, therefore, a defense that the person "thought [the entity] was *never* going to lose money." *Rossomando*, 144 F.3d at 202.

Here, the evidence was insufficient to prove that Mr. Guldi had a fraudulent intent as he believed that the money was his and no knowledge that Davidson had lied to get it. Mr. Guldi consistently expressed this belief: the day he received the Ditech letter, he told Davidson that it was the "money the DA seized." GX 204. He repeated that the next day. GX 206. He said the same thing to his friend Dan, explaining that he "recognize[d] the amount" as similar to the balance in his frozen accounts. GX 205. This belief continued after Davidson got the money, when he complained that

she was "controlling [his] money for [him]" and that he should be able to "decide what account [his] money is in." GX 230. At no point did he waiver in this belief.[6]

The government also did not prove that Mr. Guldi knew about Davidson's lies: after she had forged a letter to Ditech, Mr. Guldi told her he had decided not to write her an authorization letter. GX 211-12. As noted above, *supra* Point I, A, even after Davidson visited Mr. Guldi in person there was no indication she told him she had been lying to Ditech and had submitted a forgery. Because Mr. Guldi did not know Davidson was lying, her lies do not undercut his lack of fraudulent intent. This is in contrast to cases, cited by the government, where a person admits to lying, but claims not to have a fraudulent intent because he believed he was entitled to the money. *E.g. United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998). Mr. Guldi never even spoke to Ditech; he never lied to them.

The government, thus, failed to prove that he had no intent to harm anyone, or deprive the bank of property. Instead, his intent was to get money back that he thought was his and stop the DA's office from improperly depriving him of his own money. Therefore, there is insufficient evidence of his guilt of any of the crimes.

---

[6] This belief was also supported by the two pieces of evidence that the court had excluded: Mr. Guldi was right that his appeal would be successful and that Spota was corrupt; he won his appeal and Spota was convicted of corruption. *People v. Guldi*, 59 N.Y.S.3d 385, 388 (2d Dep't 2017); *United States v. McPartland*, 81 F.4th 101 (2d Cir. 2023) (upholding Spota's conviction and sentence).

37

D.   Mr. Guldi also lacked the necessary intent to be convicted of aiding and abetting Davidson.

Whoever "aids, abets, counsels, commands, induces or procures [an offense's] commission" or "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States" is "punishable as a principal." 18 U.S.C. § 2. To "sustain a conviction for aiding and abetting, [the Court] must find that the defendant joined the specific venture and shared in it, and that his efforts contributed to its success." *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994) (internal quotation marks omitted). An "aider and abettor" must "consciously assist[ ] the commission of the specific crime in some active way." *Medina*, 32 F.3d at 45. Aiding and abetting is a specific intent crime. *Rosemond v. United States*, 572 U.S. 65, 76 (2014) ("the intent must go to the specific and entire crime charged"). *See also United States v. Best*, 219 F.3d 192, 199 (2d Cir. 2000) ("To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted ... with the specific purpose of bringing about the underlying crime.").

Because Mr. Guldi lacked the intent to defraud, *see* Part I, B, *supra*, he also cannot be guilty under an aiding and abetting theory. Here, the government failed to prove that Mr. Guldi had knowledge of Davidson's lies. Mr. Guldi did not aid and abet Davidson in committing any crimes.

Accordingly, Mr. Guldi's convictions should be reversed.

**Point II**

**The court incorrectly instructed the jury, *inter alia* that Mr. Guldi could be guilty based on Davidson's actions *before* he had joined a conspiracy with her - even though she had no other alleged co-conspirators, and *before* he joined her fraudulent scheme.**

After the court erroneously denied Mr. Guldi's motion to dismiss by concluding that his actions *after* Davidson got the money were sufficient to convict him, the court's jury instructions allowed the jury to make the exact same mistake. These erroneous instructions on conspiracy, wire fraud, and intent were prejudicial.[7] For these errors too, Mr. Guldi's convictions should be reversed.

A.   The court's charge to the jury that Mr. Guldi could have joined an ongoing conspiracy and refusal to charge to the jury that the acts of the conspiracy had to be reasonably foreseeable were error.

In this case, there were only two alleged coconspirators. Unless they reached a criminal agreement, there was no conspiracy. *E.g. Rosenblatt*, 554 F.2d at 38. The court's charge, however, implied that there was an ongoing conspiracy that Mr. Guldi could have joined later, saying that his guilt did not depend on "whether he [ ] joined

---

[7] Standard of review: This Court reviews the propriety of jury instructions de novo. *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). Reversal is appropriate where, viewing the charge as a whole, there was prejudicial error. *Id. United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006). A charge is in error if it "either fails to adequately inform the jury of the law, or misleads the jury as to the correct standard." *Id.*, quoting *United States v. Doyle*, 130 F.3d 523, 535 (2d Cir. 1997). "An erroneous instruction, unless harmless, requires a new trial." *Id.* (quoting *United States v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).

39

[the conspiracy] at the outset or some later time." A. 273. This charge would have been correct in the context of a larger conspiracy, but because there were only two potential co-conspirators in this case, Mr. Guldi and Davidson, there could not have been a conspiracy that Mr. Guldi joined later. Without an agreement between the two of them, there simply was no conspiracy. The court's charge was, therefore, legally incorrect.

At the same time, the court refused defense counsel's request to charge the jury that Mr. Guldi could only be responsible for Davidson's actions that were "reasonably foreseeable" to him as part of the conspiracy. A. 232. This request reflected the law accurately. *See Gomez v. United States*, No. 21-2632, 2023 WL 8046326, at *6 (2d Cir. Nov. 21, 2023) ("A *Pinkerton* instruction informs the jury that it may find a defendant guilty of a substantive offense … if commission of that offense was a reasonably foreseeable consequence of the conspiratorial agreement") (internal quotation marks omitted); *United States v. Salameh*, 152 F.3d 88, 151 (2d Cir. 1998) ("we have held that "a conspirator can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement") (citing, *inter alia*, *Pinkerton v. United States*, 328 U.S. 640, 647 [1946]). It should have been granted. *See Doyle*, 130 F.3d at 535 (error if "charge either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard").

40

These errors were prejudicial, especially given how weak the government's proof related to a conspiracy. A key dispute between the parties was whether Mr. Guldi and Davidson reached a criminal agreement before she lied to Ditech and whether Mr. Guldi knew Davidson would lie to Ditech. The charging errors would have permitted the jury to convict Mr. Guldi even if he did not agree to commit fraud with Davidson before she did so and even if they did not believe Davidson's lies were reasonably foreseeably to him.

     **B.**    <u>The court's charge that Mr. Guldi could be guilty of wire fraud even if he joined at a "later point" based on Davidson's "past" actions was erroneous.</u>

The court's charge that Mr. Guldi could be guilty of wire fraud if he came in at a "later point" has been specifically rejected by the Second Circuit. *United States v. Blackmon*, 839 F.2d 900, 909 (2d Cir. 1988). In Mr. Guldi's case, during the charge for wire fraud, the court said that

> [a] person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally acts in a way to further the unlawful goals or makes the goals his own, becomes a member of the scheme and is legally responsible for that all that may have been done in the past in furtherance of the criminal objective. T. 808.

The district court in *Blackmon* had used this same language, with superficial differences,[8] and the Second Circuit reversed, saying that "with regard to substantive

---

[8] That court said, "A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and who intentionally acts in a way to further the

offenses, a defendant cannot be retroactively liable for offenses committed prior to his joining the conspiracy." *Blackmon*, 839 F.2d at 908-09 (citing, *inter alia*, *Levine v. United States*, 383 U.S. 265, 266 (1966) [per curiam]). The Circuit explained that "[b]y stating that the jury must convict a member of the conspiracy for substantive offenses committed by coconspirators prior to the member's entry into the conspiracy, the judge clearly instructed the jury contrary to settled law." *Id. See also United States v. Omar Gonzalez*, 566 F. App'x 44, 49 (2d Cir. 2014) (reiterating that "a defendant cannot be retroactively liable for [substantive] offenses committed prior to his joining the conspiracy"). *Accord United States v. Hamilton*, 587 F.3d 1199, 1208 n. 5 (10th Cir. 2009); *United States v. O'Campo*, 973 F.2d 1015, 1023 (1st Cir. 1992).

As in *Blackmon*, this charge was erroneous and the substantive wire fraud count should be vacated.

C.    <u>The court's charge undermined the defense that Mr. Guldi lacked a fraudulent intent because he believed the money was his.</u>

The court's charge also undermined the theory of the defense. Over objection, the court told the jury that it was not "relevant if the defendant thought that the money or property really belonged to him or her, or should be paid to him or her." A.

---

unlawful goals, becomes a member of the scheme and is legally responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done thereafter." *Blackmon*, 839 F.2d at 908.

229, 275. This was incorrect. As defense counsel noted, "Because an essential element of the crime charged is an intent to defraud, the defendant's good faith is a complete defense to the charge," citing *Rossomando*, 144 F.3d 197. It is a defense that the person "thought [the entity] was *never* going to lose money." *Id.* at 202. *See also United States v. Calderon,* 944 F.3d 72, 91 (2d Cir. 2019) (noting positively an instruction that "[a] genuine belief that the scheme never expose the victim to loss or risk of loss in the first place would demonstrate a lack of fraudulent intent."). The court's charge to the contrary incorrectly instructed the jury that his belief – his intent – was not relevant. This was error.

This is especially true because the court should also have granted the defense request to charge that "good faith" is a defense to the "essential element of…intent to defraud." A. 229. The court refused, and, instead, provided a good faith charge that was irrelevant to the defense theory, stating that it was a defense if a person believed that his or her "words and actions were truthful and honest." A. 275-76. Mr. Guldi's good faith defense was not that Davidson told the truth, but that Mr. Guldi – who did not know what Davidson said and had not lied himself – thought the money was his and, therefore, lacked an intent to defraud. This irrelevant good faith charge was not similar to what the defense had requested.

\*     \*     \*

43

In this close case, these charging errors allowed the jury to avoid a careful analysis of the weakness in the government's proof that Mr. Guldi joined in a conspiracy and intended to defraud Ditech. *See* Point I, *supra*. Accordingly, this Court should reverse Mr. Guldi's conviction and order a new trial.

## Point III

**The court erred in sentencing Mr. Guldi, who was 70 years old, in treatment for prostate cancer, and struggling with a host of other serious medical conditions, to 36 months of imprisonment based on an incorrect guidelines calculation and the government's unfounded assurances that prison would provide him appropriate treatment.**

George Guldi was sentenced to 36 months of incarceration based on two errors: first, the court incorrectly calculated his guidelines by determining he used sophisticated means and second, the court relied on an unsupported fact that the BOP could provide adequate cancer care. For both of these reasons, Mr. Guldi's sentence should be vacated and his case remanded for a new sentence.

### A.  Standard of Review

The "overarching" statutory directive to sentencing courts under § 3553(a) is the "parsimony" clause – the duty to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing set forth under § 3553(a)(2). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010); 18 U.S.C. § 3553(a). To fulfill this mandate, the sentencing court

must "consider every convicted person as an individual and every case as a unique study in human failings" that either mitigate or aggravate the punishment, and then impose the lowest sentence sufficient to satisfy the Section 3553(a)(2) sentencing goals. *Gall v. United States*, 552 U.S. 38, 52-53, 59 (2007) (citation omitted).

This Court reviews sentences for "unreasonableness," *United States v. Booker*, 543 U.S. 220, 261 (2005) (Remedial Op., Breyer, J.), which "amounts to review for abuse of discretion." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) *(en banc)* (citing, among other authorities, *Gall*, 552 U.S. at 46; *Kimbrough*, 552 U.S. at 111). Although reasonableness review implies deference to the district court, it does "not equate to a 'rubber stamp.'" *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006). Additionally, this Court has reviewed a challenge of the application of the sophisticated means enhancement *de novo. United States v. Hasan,* 586 F.3d 161, 168 (2d Cir. 2009); *United States v. Nawaz,* 555 F. App'x 19, 27 (2d Cir. 2014). *But see United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014) (noting a possible dispute about whether standard of review is de novo or clear error).

A court commits procedural error when it fails to calculate or consider the Guidelines range or treats the Guidelines as mandatory. *See, e.g., Cavera*, 550 F.3d at 190. A court also errs procedurally if it does not consider the Section 3553(a) factors or rests its sentence on a clearly erroneous finding of fact or a mistake of law. *See id.*; *United States v. Verkhoglyad*, 516 F.3d 122, 127 (2d Cir. 2008). A court must also resolve

"disputed facts" before relying on them at sentencing. Fed. R. Crim. P. Rule 32 (i) (3)(B) (court must "rule on the dispute" on any "controverted matter"); *United States v. Ali*, 631 F. App'x 80, 82 (2d Cir. 2016) (it was "necessary for the district court" "to resolve disputed facts" and "explain how those facts affected the court's sentencing determination"); *United States v. Fama*, 636 F. App'x 45, 49 (2d Cir. 2016) (vacating and remanding; faulting the district court's "lack of clarity" about its reliance on information without fact-finding *United States v. Feigenbaum*, 962 F.2d 230, 232 (2d Cir. 1992) (if "a court does not make findings with respect to factual disputes…the case must be remanded for resentencing, factual findings, or at least an opportunity for the judge to state whether or not any reliance was placed on the unresolved matters"). *See also United States v. Stewart*, 686 F.3d 156, 179 (2d Cir. 2012) (noting that Court had previously "faulted the district court for its 'failure to find particular facts.'") (citation omitted).

B.    <u>The sophisticated means enhancement does not apply</u>.

Mr. Guldi did not do anything sophisticated in this case. The language relating to the enhancement for sophisticated means provides:

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the

46

defendant intentionally engaged in or caused the conduct
constituting sophisticated means, increase by 2 levels.
U.S.S.G. § 2B1.1(b)(10)

The guidelines commentary defines sophisticated means as "especially complex or intricate offense conduct pertaining to the execution or concealment of an offense." Commentary to U.S.S.G. § 2B1.1, Note, 9(B). It gives examples of "hiding assets or transactions…through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.*

None of the examples in the guideline or the commentary apply to Mr. Guldi. Mr. Guldi did not relocate a scheme to evade law enforcement or commit a scheme outside the United States. The offense overall did not "otherwise" involve "sophisticated means" and Mr. Guldi did not "intentionally engage in or cause[ ] sophisticated "conduct." The regular definition of "sophisticated" also does not apply to Mr. Guldi's conduct here. Sophisticated means "highly complicated or developed" or "having a refined knowledge…through wide experience." Merriam-Webster Dictionary online, https://www.merriam-webster.com/dictionary/sophisticated. And he did nothing "complex" or "intricate" and did not use "fictious entities," "shells" or offshore accounts. He was convicted of a simple fraud, involving lying and one poorly forged document.

The government, however, stated that Mr. Guldi "instructed Davidson how to avoid bank reporting requirements and how to make it more difficult for Ditech

47

and/or law enforcement to trace the stolen funds," by "advis[ing]" her to "roll the funds…down into cashier's checks, thereby both preventing Ditech from clawing back the funds and reducing the paper trail associated with the scheme." Dkt. 186. Notably, the government cited no cases in support of its argument that using cashier's checks was sophisticated. Similarly, the government cited no cases in support of its argument that the advice that the bank had reporting requirements for amounts over $10,000 was sophisticated, especially as there was no evidence Davidson had taken this advice.

A comparison to cases where this Court found sophisticated means demonstrates that much more complex conduct is required. In *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014), for example, this Court noted that the "repetitive and coordinated nature" in shipping 17 stolen cars abroad from multiple jurisdictions, each with fraudulent titles and receipts was sophisticated. While in *United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013), the scheme was sophisticated because it (1) "lasted several years"; (2) "reflected very careful planning"; (3) included a "careful effort to conceal the fraud by lying" to business partners, lawyers, and investors; (4) "relied on creating and disseminating marketing publications that contained material misrepresentations"; and (5) involved the "creation of fictitious documents for the purpose of convincing investors to give money or not to redeem their money."

48

Unlike those cases, here, the scheme as outlined by the government was brief in duration, lasting at most three months, and related to receiving money from just one place, Ditech. There was no careful planning or complicated scheme. Even under the government's version of events, Mr. Guldi called Davidson the day he received the Ditech letter, without any specific plan to get that money. Within a few weeks, Davidson had the money; within a couple months, she had spent it all. She also created a complete paper trail. Each cashier's check bore Davidson's correct name; each was numbered; each was easily traced. This was not highly complicated or developed. It was a simple plan.

Davidson's lies were also not sophisticated and the forged document was sloppy. Mr. Guldi's name was misspelled, and the signature did not resemble his real one. In cases where false documents provide reason for this enhancement there are "complex web[s] of fraud." *United States v. Ojemen*, 465 F. App'x 69, 72 (2d Cir. 2012) ("production to various government entities and bank officials of forged paystubs, W–2 forms, and income tax returns" and then "produced further fraudulent documents to conceal his criminal activities" from his supervising probation officer). *Accord United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017) ("fabrication of sophisticated false documents relating to the status of the funds he took from his victims"); *United States v. Nawaz*, 555 F. App'x 19, 27 (2d Cir. 2014) (scheme with "forged bank documents, fraudulent property appraisals, fictitious entities, straw

49

buyers and corporate shells used to perpetrate fraudulent mortgage transactions"); *United States v. Kostakis*, 364 F.3d 45, 52 (2d Cir. 2004) ("thirty separate occasions" of "falsified entries" with "numerous technical components," as well as "hid[ing] equipment used to discharge [ ] oily water into international waters").

Because the government pointed to no authority indicating that the mere use of cashier's checks rendered the scheme sophisticated and the scheme did not involve any complexity, this Court should find that the district court erred in applying an enhancement for sophisticated means. Because this error is not harmless, this Court should vacate Mr. Guldi's sentence, and remand for a new sentencing.

C.  <u>The court's reliance on the government's unsupported assurances that the BOP could adequately treat Mr. Guldi's medical conditions was error.</u>

The defense and the prosecution disagreed as to whether the BOP could provide Mr. Guldi appropriate cancer care. The court said that Mr. Guldi's medical conditions were of "great concern" to its sentencing determination and asked numerous questions about the BOP's ability to handle them. A. 398. The government's assurances to the court that the BOP was well-equipped to treat Mr. Guldi appeared to lull the court into believing that a 36-month sentence could provide Mr. Guldi needed medical care in the "most effective manner." *See* 18 U.SC. § 3553(a)(2)(D). The court should not have relied on the government's unsupported assurances on this disputed fact. *See* Fed. R. Crim. P. Rule 32 (i) (3)(B); *Ali*, 631 F.

50

App'x at 82; *Fama*, 636 F. App'x at 49; *Stewart*, 686 F.3d at 179. Instead, it should have resolved this factual dispute before sentencing. This is especially true because, as explained below, the government's assurances do not appear to have been correct

At sentencing, the court asked numerous questions about the care Mr. Guldi would receive in custody and noting that the "only factor that is a great concern of mine is the medical condition," "[s]pecifically, it's the chemotherapy and the radiation." A. 398. The defense argued that it is "well-established that the BOP cannot provide adequate medical care to high-needs" people like Mr. Guldi. Dkt. 184. The government did not dispute these facts about BOP's medical care in its written submission, advocating that the court "should take these factors into account" and stating that Mr. Guldi's "age, health conditions, and the medical care he expects in" BOP custody "may counsel [in] favor of less" time in prison. Dkt. 186.

At sentencing, however, in response to the court's questions about whether "imprisonment [was] consistent with letting Mr. Guldi continue his radiation therapy and his chemotherapy," A. 395, the government assured the court that the BOP was well-able to treat people with "cancer [who] undergo radiation and various treatments." A. 395-96. It also stated that BOP medical facilities "would be, it sounds like, appropriate here for Mr. Guldi." A. 396. It did not support these assurances by any document or citation.

51

The defense concerns that the BOP could not effectively treat Mr. Guldi were well-founded. A 2022 DOJ inspector general report noted that the "BOP did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare." DOJ, Office of the Inspector General, "Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts awarded to the University of Massachusetts Medical School," March 2022, available at https://oig.justice.gov/sites/default/files/reports/22-052.pdf. The "BOP did not have systems to measure or track" "how long" a person had to wait to receive care after a cancelled appointments and why there was a "frequent need" to cancel appointments. *Id.* Thus "it is difficult for the BOP to determine whether [people] are receiving care within the required community standard." *Id.* at 13.

At the same time, the BOP medical departments were extremely short staffed: a 2023 DOJ report noted that only 69% of BOP medical officer positions were filled, while 89% of BOP facilities had one or more clinical positions vacant, with some facilities having no medical officers. Pandemic Response Accountability Committee, "Review of Personnel Shortages in Federal Health Care Programs During the Covid-19 Pandemic," Sept. 2023, available at https://www.va.gov/oig/pubs/VAOIG-22-03080-221.pdf.

The defense arguments related to Federal Medical Facility Butner, in particular, were also supported. News articles reported that 25% of deaths of incarcerated people

occurred in the Butner facility. Dkt. 207, citing Meg Anderson, "1 in 4 inmate deaths happens in the same federal prison. Why?," NPR, Sept 23, 2023, available at https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates (reporting that BOP's medical certification lapsed two years ago). Reporters spoke to more than a dozen incarcerated people at Butner who waited months or years for treatment, including people with cancer; many of them died. *Id. See also* Fred Clasen-Kelly, "A federal law was meant to free sick or aging inmates. Instead, some are left to die in prison," Feb. 23, 2023, NC Newsline, available at https://ncnewsline.com/2023/02/23/a-federal-law-was-meant-to-free-sick-or-aging-inmates-instead-some-are-left-to-die-in-prison/ (including story of a cancer patient at Butner).

The court did not resolve the factual dispute about the BOP's medical care. Instead, the court sentenced Mr. Guldi to 36 months and recommended that he serve the sentence in the Devens medical facility, claiming that defense counsel had said it is "the best place" to get treatment. A. 410-11. This was not an accurate portrayal of the defense argument: counsel had noted that Devens "possibl[y]" had better treatment than the "horrific" conditions at Butner, but counsel firmly argued that no BOP facility could provide effective care for Mr. Guldi. A. 410. In any event, as counsel anticipated, Mr. Guldi was not designated to Devens, but to Butner. A. 410; Dkt. 207.

In light of defense counsel's arguments, and the lack of any contrary evidence by the government, the court should not have relied on the government's unsupported representation's that the BOP could handle Mr. Guldi's medical conditions. Instead, the factual dispute about whether the BOP could adequately treat Mr. Guldi should have resolved before sentencing.

For this reason too, this Court should vacate Mr. Guldi's sentence and remand for a resentencing and further factfinding, or "at least an opportunity for the judge to state whether or not any reliance was placed on the unresolved matters." *Feigenbaum*, 962 F.2d at 232.

## Conclusion

For the reasons set forth above, the Court should reverse Mr. Guldi's conviction or vacate his sentence.

Dated:  Brooklyn, New York
    December 12, 2023

       Respectfully submitted,

       FEDERAL DEFENDERS OF NEW YORK
       APPEALS BUREAU

       *Allegra Glashausser*
       **ALLEGRA GLASHAUSSER**
       Assistant Federal Defender
       52 Duane Street, 10th Floor
       New York, New York 10007
       Tel.: (212) 417-8739

54

## CERTIFICATE OF SERVICE

I certify that a copy of this brief has been served by **ACMS** on the United States Attorney/S.D.N.Y.; Attention: **MADISON REDDICK SMYSER, ESQ.**, Assistant United States Attorney, One Saint's Andrew's Plaza, New York, NY 10007.

Dated:  Brooklyn, New York
    December 12, 2023

*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**

55

## CERTIFICATE OF COMPLIANCE WITH RULE

1. This brief complies with the type-volume limitations of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App .P. 32(f) this brief contains **13,659** words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a) (5) and type style requirements of Fed. R. App. P. 32(a) (6) because:

   This brief has been prepared in a monospaced typeface using **Microsoft Word with 14 characters per inch in Garamond** type style.

Dated:      Brooklyn, New York
              December 12, 2023

*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**
Assistant Federal Defender

56