# 23-6909

*To Be Argued By*:
JONATHAN L. BODANSKY

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 23-6909

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

GEORGE GULDI,

*Defendant-Appellant,*

VICTORIA DAVIDSON,

*Defendant,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

JONATHAN L. BODANSKY,
MADISON REDDICK SMYSER,
DANIEL C. RICHENTHAL,
KARL METZNER,
   *Assistant United States Attorneys,*
    *Of Counsel.*

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    A.  The Government's Case . . . . . . . . . . . . . . .   3

        1.  The Civil Lawsuit and Settlement
           Check . . . . . . . . . . . . . . . . . . . . . . . . . .   5

        2.  The Instant Fraud Scheme . . . . . . . . . .   6

    B.  The Defense Case and the Verdict . . . . . .   10

    C.  Guldi's Sentencing . . . . . . . . . . . . . . . . . . .   11

    D.  The District Court's Denial of Guldi's
        Motion for Bail Pending Appeal . . . . . . . .   11

ARGUMENT:

POINT I—Ample Evidence Supported the Jury's
Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .   12

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .   13

        1.  The Evidence of Conspiracy Was
           Sufficient . . . . . . . . . . . . . . . . . . . . . . .   13

        2.  The Evidence of Guldi's Fraudulent
           Intent Was Sufficient. . . . . . . . . . . . .   20

        3.  The Evidence of Aiding and Abetting
           Was Sufficient . . . . . . . . . . . . . . . . . . .   23

ii

PAGE

POINT II—Guldi's Challenges to Certain Jury
    Instructions Are Meritless . . . . . . . . . . . . . . . . 24

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 24

        1.   The Conspiracy Charge . . . . . . . . . . . 24

        2.   The Wire Fraud Charge . . . . . . . . . . 26

        3.   Fraudulent Intent Instruction . . . . . . 27

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . 28

    C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.   Guldi's Challenges to the Conspiracy
            Charge Are Both Unpreserved and
            Meritless . . . . . . . . . . . . . . . . . . . . . . 31

        2.   Guldi's Challenge to the Wire Fraud
            Charge Is Both Unpreserved and
            Meritless . . . . . . . . . . . . . . . . . . . . . . 36

        3.   Guldi's Challenges to the Fraudulent
            Intent Instruction Are Unpreserved in
            Part and Are Meritless . . . . . . . . . . . 40

        4.   Guldi Has Not Shown Prejudice . . . . . 43

POINT III—The District Court Did Not Commit
    Procedural Error in Imposing Guldi's
    Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 44

iii

PAGE

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  46

    1.  Standard of Review . . . . . . . . . . . . . . .  46

    2.  Sophisticated Means Enhancement . .  48

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  48

    1.  The Sophisticated Means Enhancement
       Was Properly Applied . . . . . . . . . . . .  48

    2.  Judge Hellerstein Did Not Improperly
       Rely on Assertions About BOP's Ability
       to Provide Medical Care . . . . . . . . . .  52

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

iv

## TABLE OF AUTHORITIES

*Cases*:

*Concepcion v. United States,*
    597 U.S. 481 (2022) . . . . . . . . . . . . . . . . . . . . . . . 55

*Gomez v. United States,*
    87 F.4th 100 (2d Cir. 2023) . . . . . . . . . . . . . . . . 35

*Greer v. United States,*
    141 S. Ct. 2090 (2021) . . . . . . . . . . . . . . . . . . . . . 30

*Henderson v. Kibbe,*
    431 U.S. 145 (1977) . . . . . . . . . . . . . . . . . . . . . . . 30

*Jackson v. Virginia,*
    443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . 12

*Jones v. United States,*
    527 U.S. 373 (1999) . . . . . . . . . . . . . . . . . . . . . . . 30

*Lauersen v. United States,*
    543 U.S. 1097 (2005) . . . . . . . . . . . . . . . . . . . . . . 48

*Neder v. United States,*
    527 U.S. 1 (1999) . . . . . . . . . . . . . . .   31, 43, 44, 54

*Pinkerton v. United States,*
    348 U.S. 640 (1946) . . . . . . . . . . . . . . . . . . . . . . . 34

*Puckett v. United States,*
    556 U.S. 129 (2009) . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Al Kassar,*
    660 F.3d 108 (2d Cir. 2011) . . . . . . . . . . . . . . . . 28

v

PAGE

*United States v. Al-Moayad,*
  545 F.3d 139 (2d Cir. 2008) . . . . . . . . . . . . . . 29, 35

*United States v. Amico,*
  416 F.3d 163 (2d Cir. 2005) . . . . . . . . . . . . . . . 49

*United States v. Avenatti,*
  2022 WL 457315 (S.D.N.Y. Feb. 15, 2022) . . . . . 41

*United States v. Bailey,*
  820 F. App'x 57 (2d Cir. 2020) . . . . . . . . . . . . . . 49

*United States v. Bastian,*
  770 F.3d 212 (2d Cir. 2014) . . . . . . . . . . . . . . 30, 39

*United States v. Blackmon,*
  839 F.2d 900 (2d Cir. 1988) . . . . . . .  32, 36, 37, 38

*United States v. Blake,*
  558 F. App'x 129 (2d Cir. 2014) . . . . . . . . . . *passim*

*United States v. Broxmeyer,*
  699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . . . . . 47, 56

*United States v. Cannon,*
  560 F. App'x 599 (7th Cir. 2014) . . . . . . . . . . 20, 41

*United States v. Capers,*
  20 F.4th 105 (2d Cir. 2021) . . . . . . . . . . . . . . . . 33

*United States v. Carr,*
  880 F.2d 1550 (2d Cir. 1989) . . . . . . . . . . . . . . . 28

*United States v. Casey,*
  951 F.2d 892 (8th Cir. 1991) . . . . . . . . . . . . . . . 20

*United States v. Cavera,*
  550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . 46

vi

PAGE

*United States v. Clements,*
73 F.3d 1330 (5th Cir. 1996) . . . . . . . . . . . . . 50, 52

*United States v. Crowley,*
318 F.3d 401 (2d Cir. 2003) . . . . . . . . . . . . . . . . 29

*United States v. Cuti,*
720 F.3d 453 (2d Cir. 2013) . . . . . . . . . . . . . . . . 13

*United States v. Elia,*
392 F. App'x 883 (2d Cir. 2010) . . . . . . . . . . . . . . 51

*United States v. Ferguson,*
676 F.3d 260 (2d Cir. 2011) . . . . . . . . . . . . . . . . 22

*United States v. Fernandez,*
443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . . 47

*United States v. Fofanah,*
765 F.3d 141 (2d Cir. 2014) . . . . . . . . . . . . . . . . 49

*United States v. Gansman,*
657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . 31

*United States v. Ghailani,*
733 F.3d 29 (2d Cir. 2013) . . . . . . . . . . . . . . . . 29

*United States v. Gole,*
158 F.3d 166 (2d Cir. 1998) . . . . . . . . . . . . *passim*

*United States v. Gordon,*
987 F.2d 902 (2d Cir. 1993) . . . . . . . . . . . . . . . . 13

*United States v. Griffin,*
597 F. App'x 20 (2d Cir. 2015) . . . . . . . . . . . . . . 55

*United States v. Guadagna,*
183 F.3d 122 (2d Cir. 1999) . . . . . . . . . . . . . . . . 13

vii

PAGE

*United States v. Hassan,*
578 F.3d 108 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 12

*United States v. Hunt,*
82 F.4th 129 (2d Cir. 2023) . . . . . . . . . . . . . . 37, 40

*United States v. Jackson,*
335 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . . . . 13

*United States v. Jackson,*
346 F.3d 22 (2d Cir. 2003) . . . . . . . . . . . . . . 48, 49

*United States v. Kennedy,*
714 F.3d 951 (6th Cir. 2013) . . . . . . . . . . . . . . . 51

*United States v. Kozeny,*
667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . . . . 12

*United States v. Lewis,*
93 F.3d 1075 (2d Cir. 1996) . . . . . . . . . 47, 49, 52

*United States v. Lorenzo,*
534 F.3d 153 (2d Cir. 2008) . . . . . . . . . . . . . . . . 13

*United States v. Maldonado-Rivera,*
922 F.2d 934 (2d Cir. 1990) . . . . . . . . . . . . . . . . 33

*United State v. Marcus,*
560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Martinez,*
136 F. App'x 415 (2d Cir. 2005) . . . . . . . . . . . . . 47

*United States v. Masotto,*
73 F.3d 1233 (2d Cir. 1996) . . . . . . . . . 28, 30, 35

*United States v. Miranda-Ortiz,*
926 F.2d 172 (2d Cir. 1991) . . . . . . . . . . . . . . . . 18

viii

PAGE

*United States v. Okeke,*
    779 F. App'x 389 (7th Cir. 2019) . . . . . . . . . . 50, 51

*United States v. Paccione,*
    949 F.2d 1183 (2d Cir. 1991) . . . . . . . . . . . . . . . 42

*United States v. Percoco,*
    13 F.4th 158 (2d Cir. 2021) . . . . . . . . . . . . . . . . 22

*United States v. Pope,*
    554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 48

*United States v. Preston,*
    499 F. App'x 70 (2d Cir. 2012) . . . . . . . . . . . . . . 55

*United States v. Richman,*
    93 F.3d 1085 (2d Cir. 1996) . . . . . . . . . . . . . . . . 48

*United States v. Rossomando,*
    144 F.3d 197 (2d Cir. 1998) . . . . . . . . . . . . . *passim*

*United States v. Sabhnani,*
    599 F.3d 215 (2d Cir. 2010) . . . . . . . . . . . . . . . . 12

*United States v. Santos,*
    541 F.3d 63 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 32

*United States v. Schultz,*
    333 F.3d 393 (2d Cir. 2003) . . . . . . . . . . . . . . . . 39

*United States v. Silver,*
    864 F.3d 102 (2d Cir. 2017) . . . . . . . . . . . . . . . . 28

*United States v. Slevin,*
    106 F.3d 1086 (2d Cir. 1996) . . . . . . . . . . . . . . . 55

*United States v. Snow,*
    462 F.3d 55 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 13

ix

PAGE

*United States v. Snow*,
663 F.3d 1156 (10th Cir. 2011) . . . . . . . . . . . 50, 51

*United States v. Suriel*,
335 F. App'x 136 (2d Cir. 2009) . . . . . . . . . . . . . 29

*United States v. Temple*,
447 F.3d 130 (2d Cir. 2006) . . . . . . . . . . . . . . . . 12

*United States v. Valente*,
688 F. App'x 76 (2d Cir. 2017) . . . . . . . . . . . 49, 52

*United States v. Vasquez*,
267 F.3d 79 (2d Cir. 2001) . . . . . . . . . . . . . . *passim*

*United States v. Verkhoglyad*,
516 F.3d 122 (2d Cir. 2008) . . . . . . . . . . . . . . . . 47

*United States v. Villafuerte*,
502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . 30

*United States v. White*,
552 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 28

*United States v. Wilkerson*,
361 F.3d 717 (2d Cir. 2004) . . . . . . . . . . . . . . . . 37

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Crim. P. 30(d) . . . . . . . . . . . . . . . . . 28, 32, 35

Fed. R. Crim. P. 52(a) . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . 44, 48, 49, 51

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 23-6909

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

GEORGE GULDI,

*Defendant-Appellant,*

VICTORIA DAVIDSON,

*Defendant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

George Guldi appeals from a judgment of conviction entered on August 4, 2023, in the United States District Court for the Southern District of New York, following a two-week trial before the Honorable Alvin K. Hellerstein, United States District Judge, and a jury.

Superseding Indictment S1 19 Cr. 126 (AKH) (the "Indictment") was filed on August 24, 2022, in five counts. Count One charged Guldi and his co-defendant Victoria Davidson with conspiring to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349.

2

Count Two charged Guldi with committing wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and Count Three charged Davidson with the same. Count Four charged Guldi with committing bank fraud, in violation of 18 U.S.C. §§ 1344 and 2, and Count Five charged Davidson with the same.

Trial commenced on January 10, 2023 and ended on January 25, 2023, when Guldi and Davidson were convicted on all counts.

On August 1, 2023, Judge Hellerstein sentenced Guldi to a term of 36 months' imprisonment, to be followed by three years' supervised release, and a $300 mandatory special assessment. On August 2, 2023, Judge Hellerstein entered an order of restitution in the amount of $358,556.

Guldi has not yet started serving his sentence.

## Statement of Facts

In February 2017, Ditech Financial LLC ("Ditech"), a mortgage servicer, received a payment of $253,236 from JPMorgan Chase Bank, N.A. ("Chase") in connection with the settlement of a civil lawsuit between multiple financial institutions. Ditech mistakenly treated the funds as a payment from Guldi toward his own residential mortgage, and it sent a letter to Guldi in March 2017 stating that it would not credit the payment because he was in arrears and owed more than that amount.

Guldi, who was in state prison at the time for insurance-related offenses, enlisted Davidson to contact Ditech and try to "break [the funds] loose," offering her

3

a cut of any money she was able to secure and giving her advice as to what might lead Ditech to send the funds to him. In the ensuing weeks, Davidson called Ditech at least 19 times and, during those calls, told multiple lies.

In April 2017, as a result of those lies, Ditech wired the funds to Davidson's personal bank account. Within two weeks, Davidson had drained the bulk of the funds out of her account, paying various of her and Guldi's expenses.

## A.   The Government's Case

The context of the Ditech fraud traces back to a house fire in November 2008. Back then, a home that Guldi owned in Suffolk County, New York (the "Property"), burned down. (GX 1101).[1] Guldi received fire insurance compensation for the Property, in the form of a check for $863,473.30. (GX 1101). The check was made out to both Guldi and Countrywide Home Loans ("Countrywide"), which was servicing Guldi's outstanding mortgage on the Property at the time of the fire. (GX 1101). Guldi deposited the check into his

---

[1]   "Br." refers to Guldi's brief; "A." refers to the appendix; "SA" refers to the supplemental appendix; "GX" refers to a Government trial exhibit; "DX" refers to a defense trial exhibit; "PSR" refers to the final Presentence Investigation Report ("Presentence Report"); "Dkt." refers to an entry on the District Court's docket. Unless otherwise noted, case text quotations omit internal quotation marks, citations, footnotes, and previous alterations.

4

bank account at Chase with a forged endorsement from Countrywide. (GX 1101).

The Property's fire insurance policy required that the fire insurance compensation be used to rebuild the Property or to pay the outstanding mortgage. (GX 1101). But Guldi withdrew the money and knowingly misused the funds, spending it on other things. (GX 1101). In early 2011, Guldi was convicted in Suffolk County Court of grand larceny in the second degree and insurance fraud in the third degree, related to his fraudulent redemption and misuse of the fire insurance proceeds (the "Insurance Fraud Case"). (GX 1101; PSR ¶¶ 15, 64-66). In connection with that conviction, a judge of the Suffolk County Court signed a restitution order in the amount of $863,473.30, to be paid to Bank of America, N.A. ("Bank of America"), which then owned the mortgage on the Property. (GX 1101; PSR ¶¶ 15, 64). That order of restitution remains outstanding. (GX 1101; PSR ¶¶ 15, 66).

Later that year, on July 29, 2011, in a different legal proceeding concerning an unrelated mortgage fraud scheme, Guldi was convicted in Suffolk County Court of 23 counts of grand larceny in the first degree, 11 counts of grand larceny in the second degree, and one count of a scheme to defraud in the first degree (the "Mortgage Fraud Case"). (GX 1101; PSR ¶¶ 16, 58-63). As a result of Guldi's convictions in those cases, he was incarcerated at Marcy Correctional Facility in upstate New York. (GX 1101).

In connection with his criminal cases, the Suffolk County District Attorney's Office (the "Suffolk County DA") froze Guldi's bank accounts at four banks,

5

including two accounts at Chase (together, the "Chase Accounts"). (GX 1101). At the time they were frozen, the Chase Accounts contained a total of $220,601.35, which was what remained of the $863,473.30 fire insurance payout. (GX 1101). Because the Chase Accounts were frozen, neither Guldi nor anyone else, including the Suffolk County DA, could lawfully access or transfer the funds in those frozen accounts absent a court order. (GX 1101). Guldi knew that his accounts were frozen. (GX 1101). Neither Guldi nor anyone acting on his behalf ever claimed that the Suffolk County DA, or anyone else, had illegally or improperly transferred assets from the Chase Accounts. (GX 1101).

### 1. The Civil Lawsuit and Settlement Check

In 2014, Countrywide and Bank of America sued Chase in Suffolk County Supreme Court for improperly allowing Guldi to deposit the $863,473.30 fire insurance check (the "Civil Lawsuit"). (GX 1103). Countrywide, Bank of America, Chase, and other parties—-including Ditech, which by that time was a sub-servicer of the mortgage on the Property—eventually settled the Civil Lawsuit in late 2016. (GX 1103).

As part of the settlement, on February 14, 2017, Chase sent a check for $253,236 to Ditech. (GX 1103). After receiving the settlement check from Chase, however, Ditech mistakenly treated it as a payment from Guldi toward his mortgage on the Property. (GX 1103). Guldi and Davidson exploited this mistake, treating it as an opportunity to defraud Ditech out of that money.

6

### 2. The Instant Fraud Scheme

On March 28, 2017, Guldi, who was incarcerated at Marcy Correctional Facility, received a letter from Ditech stating—incorrectly—that Ditech had received a payment of $253,236 from Guldi, but that the payment was insufficient to fulfill Guldi's obligations on the mortgage, which totaled over $1 million. (GX 130, 204T, 1105).[2] As a result, Ditech stated that it was not crediting the payment toward Guldi's mortgage account. (GX 130). Guldi knew that he had not made any payment on the mortgage, and thus that the letter was a mistake. (GX 204T at 2).

Later that same day, Guldi called Davidson with a proposition. (GX 204T). As Guldi knew, his calls were recorded by the Marcy Correctional Facility. (GX 1106). Guldi told Davidson about the Ditech letter and explained that he had not made the payment to Ditech, contrary to what Ditech appeared to believe. (GX 204T at 2). Unaware of the settlement between the banks and Ditech, Guldi purportedly surmised that the Suffolk County DA must have seized the money in his Chase Accounts—which were in fact still frozen—and sent that money to Ditech. (GX 204T at 2). Guldi told Davidson that if she "want[ed] to tackle this" and "manage[d] to get, break [the Ditech Funds] loose," he would pay her 10% of the $253,236.

––––––––––

[2] At trial the Government introduced numerous recorded telephone calls into evidence, along with accompanying transcripts as aids to the jury. Citations provided herein are to the transcripts.

7

(GX 204T at 3). When Davidson asked if she could call Ditech, Guldi responded, "Yes. You can do whatever you want. This is information I'm giving you to use as you will." (GX 204T at 9). Davidson proposed telling Ditech, falsely, that "this was a mistake" and that they thought the money would be "enough to just kind of hold things over." (GX 204T at 20; *see also* GX 204T at 9). Guldi told her he didn't think that would work (GX 204T at 20) and that she would have to "take a harder line with them," but she should "go with what works." (GX 204T at 10).

Davidson called Ditech the next day. (GX 101T). Pursuant to Ditech policy, however, Ditech customer service representatives would not speak to Davidson about Guldi's account because Davidson was not an authorized representative for the account. (A. 141, 147; GX 101T at 1). Davidson then forged a letter from Guldi, without his knowledge, which purported to give Davidson "full authority to manage the return" of the $253,236 payment, and directed Ditech to wire the payment to Davidson's personal bank account. (*See* GX 102T, 126, 209T, 1006). After Ditech received the forged letter on April 7, 2017, Ditech customer service representatives began discussing Guldi's account with Davidson. (*See* GX 109T-119T, 1105).

Ditech refused to send the funds to Davidson's personal bank account because, among other reasons, the funds had not come from her. (*See* GX 109T-19T). Davidson then told Ditech a number of lies to induce it to send her the money. Between April 6 and April 11, 2017, Davidson falsely told Ditech customer service representatives, among other things, that Davidson

8

and Guldi had sent the money to Ditech by mistake and in error; that the payment to Ditech was in the wrong amount and intended for another recipient; that Davidson was working with Guldi to resolve the full balance of the mortgage; that Davidson was an attorney and was going to take legal action; and that Davidson was an officer of Guldi's companies. (GX 106T-15T). Every one of these statements was false. (*See* GX 203T at 10, 204T, 1102).

On April 14, 2017, Guldi, who was not yet aware that Davidson had forged a letter purporting to authorize her to act on his behalf, called Davidson and told her that he no longer wanted her to be his so-called representative in getting the money back from Ditech. (GX 211T at 2). Davidson responded that she would like to meet in person to discuss the situation (GX 211T at 5), and she went to visit Guldi at Marcy Correctional Facility two days later, on April 16, 2017. (GX 295, 1006). That visit, unlike their calls, was not recorded. (A. 100, 105). But by the next day, Guldi and Davidson were again discussing the plan; Guldi offered to increase Davidson's share of the money they sought from Ditech from 10% to 20%, and he instructed her, among other things, to cut bank checks and to pay down his various debts if she got the money. (GX 213T).

After her in-person meeting with Guldi, Davidson called Ditech several more times trying to get the money. (*See* GX 116T-19T, 1001). On April 20, 2017, after a total of at least nineteen calls, and as a result of the lies Davidson told to Ditech during those calls, Ditech wired the money from Bank of America to

9

Davidson's personal Wells Fargo account. (*See* A. 113, 141, 147; GX 101T-19T, 403, 1001, 1109). The transfer increased Davidson's bank account balance from negative $115 to positive $253,121. (GX 403, 1005). After she received the money, Davidson began spending and moving it, including by cutting checks to pay off debts on Guldi's multiple properties and her own student loan balance. (GX 218T, 403-06, 1003, 1113).

Davidson did not inform Guldi that she had the money for about a week-and-a-half, until a call on May 1, 2017. (GX 217T-21T). On that phone call, Davidson told Guldi that she had "good news" for him and explained that Ditech had wired the money to her personal account. (GX 221T at 1-3). Guldi responded, "Wow. They wired it to you? That's interesting, we're going to have some real fun with this." (GX 221T at 3). Davidson said she was "a little nervous," and Guldi warned her that "wires can be reversed, bounced out of your account immediately." (GX 221T at 3). Guldi accordingly made a "strong suggestion" that Davidson should "[r]oll virtually all of it down into bank checks, whether you're gonna use them or not, so it's not laying in" her account. (GX 221T at 20). He also instructed her to "reduce some of it to cash" but to "never take ten at a time, you take nine, because there's additional reporting . . . requirements on ten." (GX 221T at 21). Further, he directed Davidson to spend the money in certain ways, including by cutting checks for his mortgages, child support, and tax obligations. (GX 221T).

Davidson proceeded to follow Guldi's instructions. The very next day, she purchased an approximately $49,050 cashier's check, made out to herself—which

10

resulted in those funds being immediately removed from her account. (A. 215T-16T; GX 403-04, 1004). Then, when she needed money approximately two weeks later, Davidson cashed the cashier's check, took the money she needed, and used the remainder of the funds to purchase a new cashier's check. (GX 403-04, 1004). She repeated that process twice more over the next month; each time, when she needed money, she cashed the cashier's check, took the money she needed, and then put the remainder of the funds into yet another cashier's check. (GX 403-04, 1004).

Over the course of the next six weeks, Davidson doled out the remainder of the Ditech money to pay Guldi's debts, including taxes and mortgages on some of his properties, as well as his child support obligations. (GX 221T, 403-04, 1003, 1113). She also used the money for herself, including to fund a trip to Italy and to pay for expenses related to her horse. (GX 403-04, 801, 1004). By June 15, 2017, all but $478.37 had been drained from Davidson's bank account. (GX 403, 1005).

In July 2017, Ditech discovered that Guldi and Davidson had not accidentally sent the $253,236 to Ditech, as Davidson had falsely represented to it. (PSR ¶ 34). In August 2017, Ditech requested that Guldi and Davidson return the funds, but they did not. (PSR ¶ 34).

## B. The Defense Case and the Verdict

Guldi called no witnesses and offered only two documents into evidence—a power of attorney form signed by Guldi, and a testimonial stipulation

11

concerning the same—otherwise relying on cross-examination of the Government's witnesses. (A. 218; DX A, B).

On January 25, 2023, the jury returned a verdict of guilty on all counts for both Guldi and Davidson. (PSR ¶¶ 8-9).

### C.  Guldi's Sentencing

On August 1, 2023, Judge Hellerstein sentenced Guldi to a term of 36 months' imprisonment on Counts One, Two, and Four, to run concurrently, to be followed by three years' supervised release, and imposed a mandatory $300 special assessment. (A. 373-417). The District Court also ordered Guldi to forfeit $253,236 and to pay $358,556 in restitution. (A. 380, 390-91, 411-12; Dkts. 173, 189).

### D.  The District Court's Denial of Guldi's Motion for Bail Pending Appeal

On March 11, 2024, Judge Hellerstein denied Guldi's motion for bail pending appeal. (Dkt. 245). Judge Hellerstein held that "[t]he evidence overwhelmingly proved the three counts of conviction" by demonstrating that "Guldi and Davidson plotted to cheat Ditech of money that did not belong to them and succeeded in doing so." (Dkt. 245 at 1-2). He also held that Guldi's complaints regarding the jury instructions were meritless, and that the sophisticated means sentencing enhancement was appropriate. (Dkt. 245 at 2).

12

**A R G U M E N T**

**POINT I**

**Ample Evidence Supported the Jury's Verdict**

On appeal, Guldi challenges the sufficiency of the evidence in three respects. (Br. 29-38). First, Guldi argues that the evidence was insufficient to prove that he conspired with Davidson to commit a crime, as Davidson purportedly acted on her own in lying to Ditech. (Br. 30-34). Second, Guldi argues that the evidence was insufficient to prove that he had fraudulent intent, as he purportedly had an honestly held belief that the Ditech funds were his. (Br. 34-37). Third, Guldi argues that the evidence was insufficient to prove that he aided and abetted Davidson in committing any crimes. (Br. 38). The trial record demonstrates that Guldi's arguments are meritless.

**A.  Applicable Law**

"A defendant challenging the sufficiency of the evidence bears a heavy burden," *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This Court reviews the sufficiency of the evidence *de novo*, *see United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010), but the evidence must be viewed in the light most favorable to the Government, *United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir.

13

2006), with the sufficiency test applied "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). Because "the task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court," this Court must "credit every inference that the jury might have drawn in favor of the government." *United States v. Cuti*, 720 F.3d 453, 461-62 (2d Cir. 2013).

With respect to a conspiracy conviction, the deference accorded to a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *accord, e.g., United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006). As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." *United States v. Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993). Indeed, that is "more often than not" the case. *United States v. Lorenzo*, 534 F.3d 153, 161 (2d Cir. 2008).

## B. Discussion

### 1. The Evidence of Conspiracy Was Sufficient

Guldi argues that his conspiracy conviction should be reversed because the evidence was insufficient to prove that he agreed with Davidson to commit any crime. (Br. 30-34). He argues that the evidence instead showed that Davidson alone was responsible for this

14

fraud—that she acted of her own accord, without Guldi's knowledge, much less his involvement. (Br. 30-34). The evidence proved otherwise.

The recorded prison calls between Guldi and Davidson alone established that Guldi and Davidson conspired to defraud Ditech. During their first call after Guldi received the letter from Ditech, on March 28, 2017, Guldi told Davidson that if she "manage[d] to . . . break [the funds] loose," he would give her ten percent of the proceeds, *i.e.*, approximately "twenty-five thousand dollars"—an extraordinary sum for a task that purportedly would entail only making a handful of phone calls, and thus flatly inconsistent with Guldi's assertion that there was no criminal agreement. (GX 204T at 3). To be sure, when Davidson then proposed lying to Ditech about the source of the funds, Guldi initially pushed back. But the evidence demonstrated that he did so not out of concern about the wrongfulness of Davidson's plan. (*See* GX 204T). Rather, Guldi expressed skepticism over whether Davidson's proposal would work, and he stated that she may have to take an even "harder line" with Ditech. (GX 204T at 9-10, 20). Ultimately, he told Davidson, after she made clear both her willingness and her intention to lie, that she should "go with what works." (GX 204T at 10). The jury could reasonably have inferred from this call alone that, from the outset, Guldi agreed with Davidson to commit fraud—in short, to obtain funds from Ditech using any means necessary, including lies. But the jury had far more evidence than just this first call.

15

During another call, on March 29, 2017, after Davidson had begun speaking with Ditech's representatives, Davidson shared with Guldi the nature of what she was telling Ditech; specifically, that "this [money] was sent in error, the full amount will follow, you know, or the correct amount will follow." (GX 207T at 5). In other words, Davidson made crystal clear to Guldi as early as March 29, 2017 that she was lying to Ditech, and Guldi expressed no hesitation or surprise. (*See* GX 207T).

In any event, even if the jury might have any reasonable doubt as to whether Guldi and Davidson entered into a conspiracy in these initial calls, the Government introduced overwhelming evidence of a criminal agreement by at least no later than April 16, 2017 —still several days before Ditech sent the funds to Davidson—when Davidson visited Guldi in prison. (GX 295, 1006).

Though Guldi, in the days prior, had expressed concerns about Davidson serving as his representative in getting the money back from Ditech (GX 211T at 2-3), those concerns disappeared following Davidson's visit. On a call the next day, April 17, 2017, Guldi offered to double Davidson's share of the money, from 10% to 20%, and instructed her how to spend the funds if she received them. (GX 213T at 5, 7-12). Furthermore, the evidence was clear that by the time of that visit, Davidson had told numerous lies to Ditech across many calls. (*See* GX 101T-15T; 203T-04T, 1102). The jury could reasonably have inferred that during their in-person meeting, which was not recorded, Davidson informed Guldi of those lies and the nature of what she

16

was telling Ditech, just as she had done during the March 29, 2017 call; and of course, she had no reason not to, as Guldi had made clear from the beginning that she should "go with what works."

In sum, the evidence overwhelmingly established that, at least following their in-person meeting, Guldi and Davidson were in agreement regarding the object of their conspiracy—getting the funds from Ditech— while still discussing the means and methods of achieving their goal. Indeed, the jury could have easily and reasonably inferred that the sum Guldi was then offering to Davidson—$50,000—was far more consistent with a sum offered to a co-conspirator in a criminal undertaking, rather than to a friend simply making a handful of honest, customer-service phone calls.

Guldi's reaction when he learned that Ditech had sent the money to Davidson confirms the existence of the agreement and his understanding of the nature of Davidson's lies to Ditech. At no time during his call with Davidson on May 1, 2017—when she told him that she had received the funds—or during any subsequent call, did Guldi ever suggest that he believed that Davidson had broken the funds loose either by telling the truth, *i.e.*, that the funds had not been sent by him, or by using his purported version of the truth, *i.e.*, that the funds had been illegally transferred from Guldi's frozen Chase accounts by the Suffolk County DA. (*See* GX 221T-25T, 229T-31T, 235T, 237T-38T). Never once did he ask Davidson how Ditech reacted to such an extraordinary claim, or what explanation Ditech gave as to how it came into possession of the funds. (*See* GX 221T-25T, 229T-31T, 235T, 237T-38T). Nor did

17

Guldi apparently take any steps to inform Chase or the Suffolk County Court, or any appellate court, of what had transpired (GX 1101), notwithstanding that such news would have been highly relevant to those entities and his pending appeal. Instead, Guldi announced, upon hearing the news, that he and Davidson would "have some real fun with this," and he proceeded to explain to Davidson how to hide the funds and avoid bank reporting requirements. (GX 221T at 3, 20-21). The jury could easily and reasonably have concluded that Guldi's statements and conduct demonstrated that he did not, in fact, believe that he had secured, through honest inquiry, funds stolen from his frozen accounts at Chase by the Suffolk County DA, but rather through fraud, as they had agreed. In short, one does not have to hide money—as Guldi and Davidson did—that one has received through honest conduct.

Guldi's arguments in the face of this evidence are legally and factually baseless. *First*, Guldi repeatedly references his purported belief at the time of the offenses that the $253,236 belonged to him; specifically, that the funds had been transferred to Ditech from his frozen bank accounts at Chase, as part of a corrupt scheme undertaken by the Suffolk County DA. (*E.g.*, Br. 31). He argues that this purported belief, albeit mistaken, somehow defeated any fraudulent intent or criminal agreement on his part. (Br. 31-34). As explained in greater detail below, however, this Court has unequivocally and repeatedly held that a defendant's belief that he was legally entitled to funds is not a defense to fraudulent intent, and accordingly is not relevant to guilt, because the fraud statutes criminalize schemes to obtain money or property through lies,

18

regardless of whether the defendant believes the money or property is his or "should" be provided to him. *See, e.g.*, *United States v. Blake*, 558 F. App'x 129, 130 (2d Cir. 2014); *United States v. Gole*, 158 F.3d 166, 167-69 (2d Cir. 1998). Thus, whether Guldi believed that the money was his is beside the point; the question for the jury was instead whether Guldi and Davidson agreed to and did lie to Ditech to obtain those funds. As set forth above, the jury was presented with ample evidence that they did.

*Second*, Guldi asserts that Davidson took certain actions in furtherance of the scheme without Guldi's knowledge or consent, including submitting a forged authorization letter from Guldi to Ditech; and that Davidson kept certain information from Guldi, including, at least initially, that she had received the $253,236 from Ditech. (Br. 31-32).[3] Guldi argues that these unilateral actions by Davidson showed that there was no agreement between her and Guldi. (Br. 31-32). The law is clear, however, that a conspirator need not be aware of, or involved in, all aspects of carrying out the conspiracy. *See, e.g.*, *United States v. Miranda-Ortiz*, 926 F.2d 172, 175-76 (2d Cir. 1991) ("In order to prove a defendant's membership in an alleged conspiracy, . . . [t]he government need not prove that he knew . . . all

_____

[3] Guldi emphasizes that by the time Davidson shared with Guldi that she had received the funds from Ditech, she had already dissipated the bulk of the money. (Br. 32). Guldi glosses over, however, that the majority of those funds were used by Davidson to pay Guldi's debts. (*See* GX 218T, 403-04, 1003, 1113).

19

the details of its operation, . . . so long as it proves that the coconspirators agreed on the essential nature of the plan."). Davidson taking certain actions on her own, even without Guldi's knowledge, does not undermine Guldi's conspiracy conviction, because an agreement existed between Guldi and Davidson concerning the core plan—namely, to lie to Ditech to obtain the funds. Again, as set forth above, the jury was presented with ample evidence of such an agreement.

*Third*, Guldi argues that following his in-person meeting with Davidson on April 16, 2017, he "remained focused on legitimate, legal documents"—specifically, a power of attorney form—and that this purportedly showed that Davidson did not disclose to Guldi that she had submitted the forged authorization letter, and that there was therefore no criminal agreement between the two of them. (Br. 32-33). As explained above, however, the existence of a criminal agreement does not require that each party know the full extent of the other's activities; thus, it is ultimately of no moment whether Davidson disclosed the forged document to Guldi during that meeting. Moreover, Guldi's pursuit of the power of attorney form is not inconsistent with Davidson having otherwise disclosed to Guldi her lies to Ditech, as Ditech was indeed still representing that it required a power of attorney form at the time of Davidson's April 16 visit, notwithstanding its receipt of the forged authorization letter. (*See* GX 101T-15T.) The jury was entitled to reject this argument at trial, and its verdict was amply supported.

20

### 2. The Evidence of Guldi's Fraudulent Intent Was Sufficient

Guldi next argues that his convictions should be reversed because the evidence was insufficient to prove that he acted with fraudulent intent. (Br. 34-37). Specifically, Guldi argues that fraudulent intent requires both an intent to deceive and an intent to harm, and that the evidence was insufficient to show either an intent to deceive—because Guldi purportedly had "no knowledge that Davidson had lied to get [the funds]," or an intent to harm—because Guldi purportedly "believed that the money was his." (Br. 36). The first of these arguments fails for the reasons discussed above. The second fails as a matter of law.

This Court has repeatedly held that a defendant's belief that he was legally entitled to funds is not a defense to fraudulent intent, because the fraud statutes criminalize schemes to obtain money or property through lies, regardless of whether the defendant believes the money or property is his. *See, e.g.*, *Blake*, 558 F. App'x at 130; *Gole*, 158 F.3d at 168 ("[C]ourts have uniformly held that a claim-of-right is not a defense to mail fraud." (collecting cases)); *cf. United States v. Cannon*, 560 F. App'x 599, 603 (7th Cir. 2014) ("In a prosecution for mail fraud, the government is not required to establish that the defendant's scheme was directed at obtaining money or property that he would not have been entitled to through legal means."); *United States v. Casey*, 951 F.2d 892, 894-95 (8th Cir. 1991) (victim's debt to defendant in excess of the amount obtained by defendant through fraud is irrelevant to mail fraud liability). This principle comports

21

with common sense. Defendants cannot resort to ex-
tra-legal self-help, such as lying to get "their" money,
any more than they can physically break into a bank
to get "their" money. *See Gole*, 158 F.3d at 168 (reject-
ing defendant's argument because it would mean that
"anyone who believed that he was legally entitled to
benefits from a pension plan, or an insurance policy, or
a government program ... would be given carte
blanche to lie to obtain those benefits"). Disagree-
ments about to whom funds should be provided are to
be resolved through courts, not crimes. As this Court
has put it, "controversies may be resolved by civil suit
or settlement, but cannot be won by using lies and de-
ception." *Id.*

In support of his argument, Guldi cites *United
States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998), for
the proposition that "[i]t is ... a defense that the per-
son thought the entity was never going to lose money."
(Br. 36). Guldi mischaracterizes *Rossomando*. Indeed,
this Court has explained, repeatedly—and including
in *Gole* itself—the limited and distinct holding of *Ros-
somando*.

In *Rossomando*, the defendant carelessly com-
pleted reimbursement forms with incomplete and in-
accurate tax information, believing incorrectly that
the information would not cause the victim to part
with any money. *See* 144 F.3d at 198. In short, he did
not intend his statements to cause the victim to send
money. That, of course, is not fraud, because fraud re-
quires that the statements be intended to cause the
victim to hand over money or property. Accordingly,
because the district court's instruction to the jury

22

appeared to permit conviction for misstatements alone, without an intent that those misstatements be intended to defraud, the defendant's conviction was overturned. *See id.* at 203.

In the years since *Rossomando*, some defendants have attempted to claim—as Guldi does now—that certain of the decision's language may be read to suggest that if they did not intend to "harm" the victim, because, for example, the victim should not have had the money in the first place or would have been repaid, the defendants should be acquitted. And this Court has unequivocally and repeatedly held that no such argument is proper. Rather, this Court has held, time and again, that the only "harm" that a defendant must intend to be guilty of fraud is to cause a victim to part with money or property through lies. Nothing more. *See, e.g.*, *United States v. Percoco*, 13 F.4th 158, 176-77 (2d Cir. 2021) (stating "*Rossomando* is limited to the quite peculiar facts that compelled [its] result," and explaining that where a defendant "intended immediate cognizable harm," namely to cause a victim to depart with money or property based on a lie, the defendant is guilty); *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) (affirming jury instruction that "[n]o amount of honest belief on the part of a defendant that the scheme" will "not cause anyone harm[] will excuse fraudulent actions or false representations by him or her"). Indeed, this Court made this very point in *Gole* itself. *See Gole*, 158 F.3d at 168 (holding that *Rossomando* applies only where the defendant "kn[ew] of the immateriality of the false statements made," *i.e.*, where he did not intend his statements to lead to the

23

victim sending money); *see also Blake*, 558 F. App'x at 130 (distinguishing *Rossomando* on the same basis).

Accordingly, the evidence was more than sufficient to show that Guldi and Davidson had an intent to obtain funds from Ditech through lies, and thus, that Guldi had fraudulent intent—even assuming *arguendo* that he somehow thought the funds "should" have been given to him.

### 3. The Evidence of Aiding and Abetting Was Sufficient

Finally, with respect to the sufficiency of the evidence, Guldi argues in a single paragraph that because he purportedly lacked the intent to defraud, "he also cannot be guilty under an aiding and abetting theory." (Br. 38). As set forth above, the evidence was more than sufficient to show Guldi's intent to defraud. Moreover, the recorded prison calls alone established, among other things, that Guldi (i) shared with Davidson the information about the letter from Ditech for her to "use as [she] will"; (ii) offered Davidson initially $25,000, then $50,000, to "break [the funds] loose"; and (iii) instructed Davidson on how to hide, and spend, any funds that she ultimately received. (GX 204T, 213T, 221T). Accordingly, there was ample evidence for the jury to find that Guldi "aid[ed], abet[ted], counsel[ed], command[ed], induce[d] or procure[d]," or "willfully cause[d]," 18 U.S.C. § 2, Davidson's lies to Ditech.

24

## POINT II

### Guldi's Challenges to Certain Jury Instructions Are Meritless

Guldi next argues that the District Court improperly instructed the jury in three ways. He claims that the District Court improperly instructed the jury that (i) Guldi could have joined an ongoing conspiracy and could be held responsible for Davidson's actions that were not foreseeable to him, (ii) Guldi could be guilty of wire fraud based on Davidson's actions before he joined the scheme, and (iii) Guldi could have had fraudulent intent even if he had a good faith belief that the Ditech money was his. (Br. 39-44). As to the conspiracy and substantive wire fraud instructions, Guldi failed to raise at trial the legal objections he now asserts, so his claims are subject to plain error review only. But there was no plain error, and even if there were, Guldi cannot show prejudice given the overwhelming evidence that Guldi joined the scheme to defraud Ditech from the beginning. And although Guldi objected to a portion of the good faith intent instruction, Judge Hellerstein's instructions were proper and consistent with this Court's precedent.

### A.   Relevant Facts

#### 1.   The Conspiracy Charge

In instructing the jury on the conspiracy charge, Judge Hellerstein explained that the jury must find, among other things, that the defendant became a member of the conspiracy. (A. 272-73). In doing so, Judge Hellerstein explained that the jury must ask

25

whether the defendant became a member "unlawfully, knowingly, and willfully," meaning that the defendant "participate[d] in the conspiracy with knowledge of its unlawful purpose and with the specific intention of furthering that unlawful purpose." (A. 273). He then elaborated:

> Knowledge is a matter of inference from facts proved. To have guilty knowledge, a defendant need not know the full extent of the conspiracy. Similarly, a defendant need not know all the activities of the conspiracy or even all the members of the conspiracy. A conspirator's liability is not measured by the extent or duration of his or her participation or whether he or she joined at the outset or some later time. Each member may perform separate and distinct acts at different times, and yet be conspirators. Some may play major roles; others, minor roles. Sometimes a single act may be enough to bring a defendant within the membership of a conspiracy, provided that defendant was aware of the conspiracy and knowingly associated himself with its criminal purposes.

(A. 273).

Judge Hellerstein next instructed the jury about the liability that results from membership in the conspiracy. Specifically, he explained that "[i]f membership in a conspiracy is found," then a defendant can be liable for "the reasonably foreseeable acts, declarations, statements, and omissions of some other

member of the conspiracy, which is in furtherance of the common purpose of the conspiracy[.]" (A. 277). He explained further:

> Remember I gave you this metaphor of a partnership. It is an illegal partnership. Just as the way that one partner can bind another if operating within the confines of the partnership, so the acts and mis-statements of one conspirator can be binding on another conspirator. To find the membership in the conspiracy, you can only consider the acts and statements of the conspirator you're considering. But once you become members, everybody, everything that's said and done by other conspirators in the context of the conspiracy is in effect the statements of all.

(A. 277).

## 2. The Wire Fraud Charge

With regard to substantive wire fraud, the District Court instructed the jury that the Government must prove, among other things, "the existence of a scheme or artifice to defraud." (A. 275). To that end, Judge Hellerstein explained,

> It's not necessary that the defendant participate in the alleged scheme from the beginning. A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally acts in a way to further the

> unlawful goals or makes the goals his own, becomes a member of the scheme and is legally responsible for that all that may have been done in the past in furtherance of the criminal objective, and all that is done thereafter.

(A. 275).

### 3. Fraudulent Intent Instruction

With regard to the intent necessary for wire fraud and bank fraud, Judge Hellerstein explained what the Government must prove in order to show that the defendant acted with a specific intent to defraud, including with respect to the defendant's good faith. (A. 275).

First, Judge Hellerstein instructed the jury that a defendant "acts with a specific intent to defraud if he or she intends to obtain money or property held by another through a fraudulent or deceptive scheme." (A. 275). He explained, however, that the Government "need not prove that the deceived person actually was harmed, nor is it relevant if the defendant thought that the money or property really belonged to him or her, or should be paid to him or her, or that the motives were good." (A. 275).

Second, with regard to the defendant's good faith, Judge Hellerstein explained that "[i]f the defendant had a good-faith belief that his or her words and actions were truthful and honest, you must acquit that defendant." (A. 275-76). That is because to have a specific intent to defraud, "[t]he defendant must know that his or her words and actions were untrue and deceptive and were used for the specific purpose of

28

obtaining money or property through those untruths and deceptions." (A. 275). Judge Hellerstein further explained that it is the Government's burden to prove that the defendant "lack[ed] a good-faith belief that his or her words and actions were truthful," rather than the defendant's burden to affirmatively show good faith. (A. 276). And "[i]f the government proves that beyond a reasonable doubt that the defendant knew that his or her words and actions were untrue, and intended to deceive, you should find that defendant guilty." (A. 276).

## B. Applicable Law

A defendant challenging a jury instruction faces a heavy burden: He "must demonstrate both error and ensuing prejudice." *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009). In reviewing jury instructions, this Court does not review the particular phrases challenged by the defendant in isolation; it reviews "the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Al Kassar*, 660 F.3d 108, 127 (2d Cir. 2011); *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989). A jury instruction is "erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017).

To preserve an objection to jury instructions, a defendant must "direct the trial court's attention to the contention that is to be raised on appeal." *United States v. Masotto*, 73 F.3d 1233, 1237 (2d Cir. 1996); *see also* Fed. R. Crim. P. 30(d) ("[A] party . . . must

29

inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."). When a defendant objects "only generally to the issuance of a jury instruction, and not to the specific language used by the district court, the objection to the formulation of the charge is not preserved" and is reviewed solely for "plain error." *United States v. Ghailani*, 733 F.3d 29, 52 (2d Cir. 2013). Similarly, when a defendant "states distinctly, under Rule 30, the grounds for objecting [to] the charge below, but urges a different ground on appeal, the objection is not properly preserved on appeal and [the court] therefore review[s] for plain error." *United States v. Vasquez*, 267 F.3d 79, 87 (2d Cir. 2001).

"[T]he mere fact that a defendant submitted his proposed language as part of a requested charge does not in itself preserve the point for appeal." *United States v. Crowley*, 318 F.3d 401, 412-13 (2d Cir. 2003). Therefore, "a party who has requested an instruction that has not been given is not relieved of the requirement under Rule 30 that he state distinctly his objection to the instruction that is given." *United States v. Al-Moayad*, 545 F.3d 139, 177 (2d Cir. 2008); *see also United States v. Suriel*, 335 F. App'x 136, 140 (2d Cir. 2009) (objection to jury instruction not preserved for appeal where defendant raised issue in pre-charge letter but did not object to court's instructions). "Otherwise, district judges would have to speculate on what sorts of objections might be implied through a request for an instruction and issue rulings on implied

30

objections that a defendant never intends to raise." *Jones v. United States*, 527 U.S. 373, 388 (1999).

This Court reviews preserved instructional errors *de novo*. *Masotto*, 73 F.3d at 1238. But instructions to which the defendant did not object are reviewed only for plain error, which requires that "the appellant demonstrate[ ] that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United State v. Marcus*, 560 U.S. 258, 262 (2010). "An error is 'plain' if it is so egregious and obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today." *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014). "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). "[T]he defendant has the burden of establishing each of the four requirements for plain-error relief." *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021). "Meeting all four prongs" of the plain error standard "is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009). Indeed, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

31

Even where a jury-instruction objection was preserved, reversal is not warranted if the alleged error was harmless. Fed. R. Crim. P. 52(a); *United States v. Gansman*, 657 F.3d 85, 91-92 (2d Cir. 2011). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

## C.   Discussion

### 1.   Guldi's Challenges to the Conspiracy Charge Are Both Unpreserved and Meritless

Guldi challenges the conspiracy charge on two grounds, arguing that the District Court erred in (i) instructing the jury that the defendants could join the conspiracy at "some later time" after the conspiracy began, and (ii) declining his proposed instruction that co-conspirators can only be liable for the reasonably foreseeable acts of others in the conspiracy. (Br. 39-41). Both challenges are unpreserved, and neither has merit.

Guldi first challenges the instruction that "[a] conspirator's liability is not measured by the extent or duration of his or her participation or whether he or she joined at the outset or some later time." (A. 273). At trial, Guldi did not object to this instruction at all, let alone raise the argument that he does now.

32

Accordingly, his challenge is reviewable for plain error alone. *See* Fed. R. Crim. P. 30(d).[4]

There is no error with regard to this instruction, let alone plain error. Indeed, the instruction, as Guldi admits, accurately reflects conspiracy law. (*See* Br. 40). *See, e.g.*, *United States v. Santos*, 541 F.3d 63, 73 (2d Cir. 2008) ("A defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member."); *United States v. Blackmon*, 839 F.2d 900, 908 (2d Cir. 1988) ("[W]ith regard to liability for *conspiracy*, a defendant may be legally responsible for acts of coconspirators prior to that defendant's entry into the conspiracy.").

Rather than argue that the instruction is incorrect on its face, Guldi claims that it is "legally incorrect" in this particular case because, he asserts, there were

-------------

4   Guldi did object to a portion of the draft charge that proposed instructing the jury that the defendants "may have joined [the conspiracy] at any time in its progress, and they will still be held responsible for all that was done before they joined and all that was done during the conspiracy's existence while they were a member." (*See* A. 225; SA 533). Specifically, he objected that this instruction was "repetitive" (A. 225), and Judge Hellerstein did not ultimately give it. Guldi did not raise any legal arguments as grounds for his objection and rightfully makes no claim that this objection preserved his challenge to the earlier jury instruction. *See Vasquez*, 267 F.3d at 87.

33

only two potential co-conspirators—Guldi and Da-
vidson—and "without an agreement between the two
of them, there simply was no conspiracy." (Br. 40). He
argues that the instruction incorrectly implied that
there was an ongoing conspiracy that he could join.
(Br. 39). But even assuming that the evidence at trial
revealed just two co-conspirators, the instructions,
when "viewed as a whole," were correct. *United States
v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021); *see also
Vasquez*, 267 F.3d at 88; *United States v. Maldonado-
Rivera*, 922 F.2d 934, 960 (2d Cir. 1990). Before the
instruction at issue, Judge Hellerstein instructed the
jury that it must find "that the conspiracy charged in
the indictment actually existed." (A. 272-73). In doing
so, he repeatedly made clear that an agreement be-
tween two people is required for a conspiracy to exist.
(*See, e.g.*, A. 273 ("A conspiracy is a kind of criminal
partnership, an agreement of two or more persons to
join together to accomplish an unlawful purpose.");
A. 273 ("To show that a conspiracy existed, the govern-
ment must prove that two or more persons made an
agreement to violate a particular law."); A. 273 ("Ex-
press language or specific words are not required. It is
sufficient if two or more persons in any manner,
whether they say so directly or not, come to a common
understanding to violate the law."); A. 273 ("If upon
consideration of all the evidence, direct and circum-
stantial, you find beyond a reasonable doubt that the
minds of two or more of the conspirators met, that is,
they agreed to work together to further an unlawful
scheme alleged in the indictment, then proof of the ex-
istence of the conspiracy is satisfied.")). And the Gov-
ernment made no argument suggesting that Davidson

34

was operating as part of a conspiracy separate from Guldi, which Guldi then joined at a later time. In light of the evidence and the Government's theory of the case, no reasonable juror could have interpreted the instructions as permitting conviction on the ground that Guldi presses.

Guldi next argues that the District Court should have adopted his suggestion that co-conspirator acts must have been reasonably foreseeable to the defendant to be considered against that defendant. (Br. 40). At the charge conference, the District Court proposed instructing the jury that:

> If you find beyond a reasonable doubt that each defendant was a member of the conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by them or by others in the conspiracy may be considered against that defendant, even if such acts and statements were made in defendant's absence and without their knowledge.

(SA 550). Guldi objected, asking that the District Court add to the end of the paragraph the caveat "[i]f you also find that those acts were reasonably foreseeable to the defendant." (A. 232). Judge Hellerstein declined the change (A. 233), but did not use this full instruction in the final charge (*see* A. 277).

Now, citing cases that, in turn, cite or reference *Pinkerton v. United States*, 348 U.S. 640 (1946), Guldi argues that his proposed instruction "reflected the law

35

accurately." (Br. 40). But at the charge conference, Guldi did not raise this argument or even reference *Pinkerton* liability. His request, which raised no legal argument or grounds for the objection, was insufficient to preserve his objection. Thus, his argument in this respect is also subject to plain error review. *See* Fed. R. Crim. P. 30(d) (requiring that parties objecting "to a failure to give a specific instruction must inform the court of the specific objection *and the grounds* for the objection" (emphasis added)); *Al-Moayad*, 545 F.3d at 177 ("[A] party who has requested an instruction that has not been given is not relieved of the requirement under Rule 30 that he state distinctly his objection to the instruction that is given.").

The District Court did not err, let alone plainly err, by declining to give Guldi's requested *Pinkerton* instruction. Guldi was proposing to change Judge Hellerstein's conspiracy charge. *Pinkerton*, however, governs a defendant's liability for substantive crimes, not for a conspiracy crime. *See, e.g.*, *Gomez v. United States*, 87 F.4th 100, 109 (2d Cir. 2023) ("[U]nder a *Pinkerton* theory the defendant is convicted of the substantive offense—not of conspiring to commit the offense[.]"); *Masotto*, 73 F.3d at 1239 ("Under the *Pinkerton* theory of liability, a conspirator can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes."). But when assessing "liability for *conspiracy*, a defendant may be legally responsible for acts of coconspirators prior to that defendant's entry into the conspiracy," which may not

36

have been foreseeable to him. *Blackmon*, 839 F.2d at 908-09.

In addition, when viewing the charge as a whole, Judge Hellerstein's instructions included language addressing Guldi's concern. Before he finished his conspiracy instructions, Judge Hellerstein stated, "[i]f membership in a conspiracy is found, the reasonably foreseeable acts, declarations, statements, and omissions of some other member of the conspiracy, which is in furtherance of the common purpose of the conspiracy, can be considered the acts of all its members." (A. 277). Accordingly, there was no error.

### 2. Guldi's Challenge to the Wire Fraud Charge Is Both Unpreserved and Meritless

With regard to the substantive wire fraud charge, Guldi argues that under *Blackmon*, the District Court erred in instructing the jury that "[a] person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally acts in a way to further the unlawful goals or makes the goals his own, becomes a member of the scheme and is legally responsible for . . . all that may have been done in the past in furtherance of the criminal objective, and all that is done thereafter." (A. 275). This challenge is similarly unpreserved and meritless.

At the charge conference, Guldi objected only to the phrase "with knowledge of the scheme's general operation, although not necessarily all of its details," asserting that it was "vague" and "could be confusing to the jury." (A. 229). He therefore failed to object to the

37

portions of the instruction he now supposedly finds problematic and also failed to raise the legal argument he now advances. This is insufficient to preserve his objection. *See United States v. Hunt*, 82 F.4th 129, 139 (2d Cir. 2023) (reviewing for plain error where defendant advanced an argument below that was "materially different from the objection raised here"); *Vasquez*, 267 F.3d at 87 (same where defendant "asserts on appeal a different objection to the charge than he advanced below").

And again, there was no error in the instruction, let alone plain error, because *Blackmon* is distinguishable, and the charge as a whole did not "mislead[ ] the jury as to the correct legal standard" or fail to "adequately inform the jury on the law." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). In *Blackmon*, the district court instructed the jury on wire fraud, stating that "[a] person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and who intentionally acts in a way to further the unlawful goals, becomes a member of the scheme and is legally responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done thereafter." 839 F.2d at 908. The jury asked for clarification about the instruction, and the district court said:

> So long as the transaction is within the general scope of the scheme on which all defendants had embarked a defendant not directly connected with a particular fraudulent act is nonetheless responsible

38

> therefor if it was of the kind as to which
> all parties had agreed. It follows that as
> to all defendants who were members of a
> single scheme *it is your duty to find them
> guilty of all substantive crimes* committed
> in furtherance of that single scheme
> whether or not they were directly in-
> volved in a particular fraudulent transac-
> tion.

*Id.* The jury convicted, and this Court vacated, ex-
plaining that "[b]y stating that the jury must convict a
member of the conspiracy for substantive offenses
committed by coconspirators prior to the member's en-
try into the conspiracy, the judge clearly instructed the
jury contrary to settled law." *Id.* at 909.

Here, although Judge Hellerstein gave an instruc-
tion similar to the district court's initial instruction in
*Blackmon,* he did not include the key sentence that led
this Court to vacate—he did not, unlike the district
court in *Blackmon,* instruct the jury that it *must* find
the defendant guilty of all substantive crimes commit-
ted prior to his joining the wire fraud scheme. *See id.*
at 908 (instructing jury that "*it is your duty to find [de-
fendants] guilty of all substantive crimes*" committed
in furtherance of scheme). Guldi does not contend oth-
erwise.

Rather, he argues that there is a more nuanced er-
ror in the instructions in this case, namely, that the
District Court's instruction, even without this key sen-
tence, required the jury to convict the defendants
based on substantive offenses committed before they
joined the conspiracy. As explained below, Guldi is

39

wrong. But even if he were right, the alleged error of which he complains was anything but "so egregious and obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today." *Bastian*, 770 F.3d at 220. On the contrary, Guldi's argument involves a parsing of parts of *Blackmon* and this Court's instructions to locate a potential problem. That is not plain error, even if it were error.

Further, when viewing the instructions as a whole, there was no error at all. The pertinent question is not whether an instruction "precisely quotes language suggested by Supreme or Appellate Court precedent," but, rather, "whether considered as a whole, the instructions adequately communicated the essential ideas to the jury." *United States v. Schultz*, 333 F.3d 393, 413-14 (2d Cir. 2003). The instructions as a whole here communicated to the jury the concept that Guldi had to join the substantive wire fraud scheme before the wire fraud was complete, even if some actions had already been taken toward accomplishing the fraud. For example, when instructing the jury as to the requisite intent for wire fraud, the District Court explained that "[a]ll that is important is that the defendant specifically intended to obtain the money or property through fraud or deception, and the government must prove that as to each defendant beyond a reasonable doubt." (A. 275). Pursuant to this forward-looking intent instruction, the jury had to find that Guldi intended to obtain money or property through fraud or deception before the money was obtained and the fraud complete. Consequently, the jury would necessarily have found that Guldi joined and participated in the wire fraud, instead of finding only that Guldi

40

joined the scheme after the fraud was complete and retroactively holding him liable. In short, even if Guldi had preserved his claim (and he did not) such that it were reviewed for error rather than plain error, the claim still fails.

### 3. Guldi's Challenges to the Fraudulent Intent Instruction Are Unpreserved in Part and Are Meritless

Guldi first argues that the District Court should not have instructed the jury that it was "not relevant if the defendant thought that the money or property really belonged to him or her, or should be paid to him or her"—an instruction he claims was legally incorrect under *Rossomando* and "undermined the theory of the defense," namely that Guldi lacked fraudulent intent because he believed the Ditech money was his. (Br. 42-43). But this argument too was not preserved. At the charge conference, Guldi objected to this instruction, but in doing so, he asked only for the District Court to remove the language or replace the word "relevant" with the word "dispositive." (A. 229). Guldi's objection below fell far short of his Rule 30 obligations. Even had he "stat[ed] distinctly" his "grounds for objecting [to] the charge below," Guldi now "urges a different ground on appeal." *Vasquez*, 267 F.3d at 87; *see also Hunt*, 82 F.4th at 139 (holding that objection to jury instruction was not preserved where "it was materially different from the objection raised here"). Accordingly, Guldi's argument should be reviewed for plain error alone.

There was no error, let alone plain error, in the instruction. As discussed above, this Court has

41

repeatedly held that "a claim of right to funds obtained through a false statement is not a defense negating fraudulent intent." *Blake*, 558 F. App'x at 130; *see also*, *e.g.*, *Gole*, 158 F.3d at 168; *Cannon*, 560 F. App'x at 603. Consequently, Judge Hellerstein correctly conveyed to the jury that "whether or not [the defendants] genuinely believed that [Guldi] was ultimately entitled to the money [they] took" from Ditech is "irrelevant" as to whether they committed bank and wire fraud. *United States v. Avenatti*, 2022 WL 457315, at *15 (S.D.N.Y. Feb. 15, 2022).

Guldi, however, argues that Judge Hellerstein's instruction was incorrect because under *Rossomando*, "[i]t is a defense that the person 'thought [the entity] was *never* going to lose money.'" (Br. 43 (quoting *Rossomando*, 144 F.3d at 202)). But, as discussed earlier, *Rossomando* is not that broad. In addition, when viewing the jury charge as a whole, Judge Hellerstein conveyed to the jury that the defendants must have specifically intended to defraud the victim and obtain money from Ditech. (*See* A. 275 (explaining that jury must find the defendant "kn[ew] that the scheme would have the effect of defrauding the victim, and specifically intending to defraud the victim" and that he "intend[ed] to obtain money or property held by another")).

Guldi's second challenge is that the District Court should have instructed the jury using his proposed good-faith instruction, rather than the one the District Court gave, because that instruction was "irrelevant to the defense theory." (Br. 43). However, Judge Hellerstein did not err in instructing the jury on good faith.

42

In his good-faith instruction, Judge Hellerstein explained that the Government must prove that "the defendant lack[ed] a good-faith belief that his or her words or actions were truthful." (A. 275-76). Such an instruction is in accord with this Court's precedent that an "honest misstatement is insufficient to prove fraudulent intent." *Blake*, 558 F. App'x at 130 (citing *Rossomando*, 144 F.3d at 200-03); *see also United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (holding that district court "gave the essence of a proper good-faith defense in its jury charge" where it instructed the jury that "[a]n honest belief in the truth of the representations made by a defendant is a good defense, no matter how inaccurate the statements may turn out to be").

Without contesting that this instruction is legally correct, Guldi argues, citing *Rossomando*, that the District Court erred in not giving his proposed good-faith instruction: "[b]ecause an essential element of the crime charged is an intent to defraud, the defendant's good faith is a complete defense to the charge." (Br. 43 (quoting *Rossomando*, 144 F.3d at 199)). Not so. Neither *Rossomando*, nor any other case of this Court, embraces such a broad good-faith instruction. Indeed, after the district court in *Rossomando* stated that "good faith is a complete defense to the charge," it continued: "[E]ven false representations or statements or omissions of material fact do not amount to fraud unless done with fraudulent intent, as I've told you. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by the defendant or an honest belief that all material

43

information had been disclosed is a good defense, how-ever inaccurate the statements may turn out to be."[5] 144 F.3d at 199. This instruction stresses, as Judge Hellerstein did, that a good-faith defense is premised on an honest belief that the statements made are true. Good faith in any respect is not, as Guldi suggests, a blank check that negates fraudulent intent.

Guldi also argues that the good-faith instruction that Judge Hellerstein gave was inapplicable because his defense was not that Davidson told the truth but rather that he lacked an intent to defraud because he thought the money was his. (Br. 43). Although that was the defense that Guldi wished to advance, it is a defense barred by this Court's precedent, as described above, and does not make Judge Hellerstein's instruc-tions improper.

### 4. Guldi Has Not Shown Prejudice

In any event, Guldi also has not shown that he was prejudiced in any way by these instructions, even as-suming that they were wrong. The evidence that Guldi agreed with Davidson to commit wire fraud and bank fraud before Ditech transferred the money is "over-whelming." *Neder*, 527 U.S. at 16. Similarly, there was "overwhelming" evidence that Guldi had the requisite fraudulent intent, including because he introduced the

---

[5] Although this Court vacated the conviction in *Rossomando*, it did not take issue with this section of the good-faith instruction. *See* 144 F.3d at 200-03 (dis-cussing portions of good-faith jury charge and supple-mental instruction that warranted reversal).

44

idea of the conspiracy to Davidson and agreed with her to obtain the Ditech funds through lies. *Id.*

## POINT III

### The District Court Did Not Commit Procedural Error in Imposing Guldi's Sentence

Guldi argues that his sentence was unreasonable because of two alleged procedural errors: that the District Court (i) incorrectly applied a sophisticated means Guidelines enhancement and (ii) improperly relied on the Government's assertions that the Bureau of Prisons ("BOP") could provide adequate medical care for Guldi. (Br. 44). Neither was an error (and the second claim is also unpreserved), and Guldi's below-Guidelines sentence of 36 months' imprisonment should be affirmed.

### A. Relevant Facts

During Guldi's sentencing, Judge Hellerstein found, consistent with the Probation Office, that Guldi's Guidelines range was 46 to 57 months' imprisonment, based on an offense level of 21 and a criminal history category of III. (A. 378-79). This calculation included an enhancement, over Guldi's objection, for use of sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C). (*See* A. 377-78).

During the sentencing hearing, Guldi asked for a time-served sentence, based in large part on his age and his health. (A. 392). Guldi's counsel explained that, among other things, Guldi had been diagnosed with prostate cancer and had undergone radiation and

45

may need chemotherapy in the future. (A. 392-94). Judge Hellerstein asked the Government whether "imprisonment [is] consistent with letting Mr. Guldi continue his radiation therapy and his chemotherapy." (A. 395). The Government responded, "Your Honor, yes, I think it is. There are medical facilities in the Bureau of Prisons . . . and inmates have cancer and undergo radiation and various treatments, which would be, it sounds like, appropriate here for Mr. Guldi." (A. 395-96).

With regard to BOP medical facilities, Judge Hellerstein said that "[t]he primary medical facility is in North Carolina," to which Guldi's counsel responded, "And they are being sued for lack of care. Butner is—I have a client who has medical problems at Butner, and I get letters from him on a monthly basis just how horrific it is down there." (A. 401-02). The Government mentioned that there is also a "BOP medical facility in [Devens,] Massachusetts, about two hours away from where Mr. Guldi is living." (A. 408). Guldi's counsel pointed out that "[w]hile it's possible that it might provide better care than Butner, there's absolutely no guarantee that's where he would go, given the small number of beds[.]" (A. 410). Guldi's counsel then proffered that "in the seven years that I have been a federal defender, any time I have a sick client, I ask [that they] go to Devens, and I have only had one client go in those seven years." (A. 410).

Judge Hellerstein ultimately imposed a below-Guidelines sentence of 36 months' imprisonment, which was consistent with the recommendation of the Probation Office and the Government. In doing so, he

46

took into account Guldi's medical conditions. Judge Hellerstein explained, "I think Mr. Guldi deserves a time in confinement, I probably would have, if he were healthy, given him more than 36 months. But it's hard for me to go below it. I think the crime was a very serious one." (A. 397). In addition, he said, "[t]he great appeal that you have is that you have medical problems that compound your age. Although I have to weigh those issues, I think the nature of the crime and the deterrence needed to persuade others not to commit such crimes and to make sure that you again are not tempted to do so is necessary." (A. 410-11). Judge Hellerstein then recommended that Guldi be designated to Devens "for the reason of the medical care that is likely to be given there. Mr. Guldi is in need of radiation therapy. He may be in need of chemotherapy, both of which are very delicate and need to be continually balanced. And from what [defense counsel] tells me, . . . Devens is the best place to get that." (A. 411).

## B.  Applicable Law

### 1.  Standard of Review

Appellate review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). A district court commits procedural error where it fails to calculate the Guidelines range, makes a mistake in its Guidelines calculation, treats the Guidelines as mandatory, does not consider the Section 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact. *Id.* at

47

190. This Court "entertain[s] a strong presumption" that a sentencing judge has "faithfully discharged" his or her duty to consider the Section 3553(a) factors and the arguments bearing on those factors "in the absence of record evidence suggesting otherwise." *United States v. Fernandez*, 443 F.3d 19, 29-30 (2d Cir. 2006).

Where a defendant contests the procedural reasonableness of his sentence on appeal but did not raise his objections before the District Court, this Court reviews the challenge for "plain error." *United States v. Verkhoglyad*, 516 F.3d 122, 127-28 (2d Cir. 2008). If the defendant objected to the district court's application of the Guidelines below, this Court reviews the district court's findings of fact for clear error, and its application of the Guidelines to those facts *de novo*, "giving due deference to the sentencing court." *United States v. Lewis*, 93 F.3d 1075, 1079 (2d Cir. 1996). Further, a district court has "broad discretion as to what types of procedures are needed at a sentencing proceeding for determination of relevant disputed facts," and its "discretion is similarly broad either as to the kind of information it may consider, or the source from which it may come." *United States v. Martinez*, 136 F. App'x 415, 416 (2d Cir. 2005). These determinations are reviewed for abuse of discretion. *Id.*

"The particular weight to be afforded aggravating or mitigating factors is a matter firmly committed to the discretion of the sentencing judge." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). Generally, if "the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, [this Court] will not second

48

guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor." *United States v. Pope*, 554 F.3d 240, 246-47 (2d Cir. 2009).

## 2. Sophisticated Means Enhancement

Pursuant to Section 2B1.1(b)(10)(C) of the Guidelines, a two-level enhancement is warranted when "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The application note to that section defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B). Where a defendant's scheme involves various steps, the enhancement may apply "even if each step in the scheme was not elaborate." *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003), *vacated on other grounds sub nom. Lauersen v. United States*, 543 U.S. 1097 (2005). "Once the factual predicate for the enhancement is satisfied, its application is mandatory." *United States v. Richman*, 93 F.3d 1085, 1088 (2d Cir. 1996).

## C. Discussion

### 1. The Sophisticated Means Enhancement Was Properly Applied

The District Court properly applied the sophisticated means enhancement because Guldi engaged in sophisticated behavior to conceal the fraud. He did this by, among other things, instructing Davidson (i) to use

49

cashier's checks, and (ii) to avoid bank reporting requirements. This conduct, which is aimed at "hiding assets or transactions" falls well within the scope of the sophisticated means enhancement, U.S.S.G. § 2B1.1 app. n.9(B). The enhancement is "designed to increase punishment in cases that, because of their sophistication, might be harder to detect and therefore require additional punishment for heightened deterrence." *Lewis*, 93 F.3d at 1081. And this Court has time and again found that conduct designed to make frauds difficult to detect constitutes use of sophisticated means. *See, e.g.*, *United States v. Bailey*, 820 F. App'x 57, 62 (2d Cir. 2020) (applying enhancement where defendant "moved money between several bank accounts" and used businesses to hide his transactions); *United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017) (same where defendant argued conduct was not "especially complex or especially intricate" but involved "only the quantum of concealment"); *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014) ("We have recognized that the creation and use of false documents, and other tactics to conceal offense conduct, are indicia of the sophistication of an offense."); *United States v. Amico*, 416 F.3d 163, 170 (2d Cir. 2005) (applying enhancement where defendant "recommended strategies" to "reduce the likelihood" that lenders would "discover the fraud"); *Jackson*, 346 F.3d at 25 (same where defendant used "prepaid phone cards to prevent tracking of his activities"). This is exactly the kind of behavior that Guldi, a sophisticated attorney, engaged in to hide his crimes.

With regard to cashier's checks, Guldi advised Davidson to roll the funds stolen from Ditech down into

50

cashier's checks, thereby both preventing Ditech from clawing back the funds and reducing the paper trail associated with the scheme. (*See* GX 221T at 20). Use of cashier's checks helps conceal the funds because when a cashier's check is purchased, the funds at issue are immediately moved out of an individual's bank account and are subsequently held by the bank (A. 200), making it difficult, if not impossible, for those funds to be reclaimed by a fraud victim. Consistent with Guldi's instructions, Davidson purchased not only multiple cashier's checks to pay off Guldi's debts, but she also purchased an approximately $49,000 cashier's check in her name. (*See* GX 1003). Davidson then used the cashier's check in her name as an essentially untraceable debit card. When she needed to make additional payments on Guldi's behalf or take out cash for her own use, she would cash the cashier's check, take out the necessary money, and purchase another cashier's check with the remainder. (*See* GX 1004). Over the next few weeks, she purchased three additional cashier's checks with those funds. (*See* GX 1004). Courts have found use of multiple cashier's checks to conceal fraud, as Guldi instructed, to be sophisticated. *See, e.g.*, *United States v. Okeke*, 779 F. App'x 389, 392 (7th Cir. 2019); *United States v. Snow*, 663 F.3d 1156, 1164 (10th Cir. 2011); *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996).

As to reporting requirements, Guldi further advised Davidson to avoid any cash transactions of $10,000 or more, thereby avoiding bank reporting requirements associated with such transactions. (*See* GX 221T at 21). Despite Guldi's assertion to the contrary (*see* Br. 48), there was evidence at trial that

51

Davidson followed this advice and limited her cash transactions. For example, on June 16, 2017, after cashing one of the cashier's checks discussed above, Davidson took $7,000 and deposited that cash into her bank account. (GX 1004). Then, three days later, she again cashed a cashier's check and deposited $3,000 in cash into her account. (GX 1004). She then used this combined $10,000 to fund a trip to Italy. (GX 1004). As with cashier's checks, courts have held that transactions meant to avoid bank reporting requirements are sophisticated. *See, e.g.*, *United States v. Elia*, 392 F. App'x 883, 886 (2d Cir. 2010) (applying enhancement where defendant, among other things, purchased money orders at multiple locations and "structure[ed] investments in multiple deposits to avoid reporting requirements"); *Okeke*, 779 F. App'x at 392 (same where defendant, among other things, withdrew funds "in amounts below $10,000 to avoid the banks' reporting threshold"); *United States v. Kennedy*, 714 F.3d 951, 961 (6th Cir. 2013) (same where defendant, among other things, "restructur[ed] deposits to avoid bank-reporting requirements"); *Snow*, 663 F.3d at 1164 (same where defendant "disburs[ed], and instruct[ed] others to disburse, funds below the currency transaction reporting threshold").

Guldi argues that the District Court erred in applying the sophisticated means enhancement because Guldi did not use "fictitious entities, corporate shells, or offshore financial accounts"—acts the Guidelines commentary provides as examples of when the enhancement is "ordinarily" appropriate. (Br. 47 (quoting U.S.S.G. § 2B1.1 app. n.9(B))). But as this Court has explained, while the "absence" of these particular

52

acts "might mean that the case cannot be disposed of by reference to one of the examples specifically enumerated in the commentary, the examples are by their own terms simply illustrative, not exclusive." *Lewis*, 93 F.3d at 1082.

Similarly, Guldi argues that the District Court should not have applied the enhancement because this Court has applied it in more complex cases. (Br. 48). But even if this case "cannot be described as singularly or uniquely sophisticated, it is more complex than the routine" wire fraud for the reasons described above. *Lewis*, 93 F.3d at 1082. Guldi points out, for example, that the scheme lasted only a few months and that some of the cashier's checks bore Davidson's name, but these facts do not prevent a finding of sophisticated means. *See, e.g.*, *id.* at 1083 (explaining that while "identity concealment is a relevant factor in determining whether a scheme used sophisticated means[,] . . . it is not the *sine qua non* of a sophisticated . . . scheme"); *Clements*, 73 F.3d at 1340 (applying enhancement where charged scheme spanned from March to July). Indeed, use of just one sophisticated tactic can render the sophisticated means enhancement appropriate. *See Valente*, 688 F. App'x at 80 (applying enhancement where defendant fabricated false documents).

### 2. Judge Hellerstein Did Not Improperly Rely on Assertions About BOP's Ability to Provide Medical Care

Guldi also argues that Judge Hellerstein should have resolved the "factual dispute" about whether the

53

BOP could provide adequate medical care for him before sentencing, claiming that the Court relied on the Government's "unsupported assurances on this disputed fact." (Br. 50-51). Guldi's argument is both unpreserved and wrong. Judge Hellerstein solicited opinions from both parties on the BOP's ability to provide medical care. At no point did Guldi object or ask the District Court to resolve the "factual dispute" in a hearing or otherwise. In any event, Judge Hellerstein's below-Guidelines sentence, which took into account Guldi's medical condition and recommended that he be designated to a medical facility, was plainly reasonable.

Indeed, Judge Hellerstein focused on Guldi's medical issues throughout the sentencing proceeding. (*See* A. 398 (stating his medical conditions were of "great concern")). Guldi took the opportunity, both in his sentencing submission and in his argument at the sentencing proceeding, to argue that a time-served sentence was warranted because of those conditions, including his belief that the BOP cannot provide him with adequate care. (*See* Dkt. 184 at 15-17; A. 392-402, 410). In response to the District Court's question as to whether imprisonment is "consistent with letting Mr. Guldi continue his radiation therapy and [future] chemotherapy," the Government did not provide "unsupported assurances" that the BOP was "well-able" to care for Guldi, as he now alleges (Br. 50-51); instead, the Government responded that the BOP has medical facilities and that "inmates have cancer and undergo radiation and various treatments." (A. 395-96). Guldi

54

did not dispute the factual accuracy of this statement at the time of his sentencing, nor can he now.[6]

In any event, had Guldi objected that the District Court needed to do something more in order to resolve the alleged "factual dispute" about the BOP's medical care facilities, Judge Hellerstein still would not have erred in conducting the sentencing hearing in the way that he did. Where there is a disputed sentencing issue, the district court is not required "to hold a full-blown evidentiary hearing"; instead, "[a]ll that is required is that the court afford the defendant some opportunity to rebut the Government's allegations."

─────────────

[6]   Indeed, the BOP has facilities characterized by four "Care Levels" and has published guidance about how inmates are designated to different facilities based on their medical conditions. *See* Care Level Classifications for Medical and Mental Health Conditions or Disabilities, Federal Bureau of Prisons (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf This guidance explains that Care Level 4 facilities may be appropriate for inmates like Guldi who have "biopsy-confirmed prostate cancer [and] are candidates for active treatment." *Id.* at 3. Care Level 4 facilities, which include FMC Butner, where Guldi has been designated, can provide "significantly enhanced medical services and limited inpatient care," including, among other things, active treatment for cancer. *Id.* at 3; FMC Butner—Federal Medical Center Butner—FMC Butner Prison, https://federalcriminaldefenseattorney.com/federal-bureau-prisons/fmc-butner/.

55

*United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996). And the decision about what kind of procedure to follow "lie[s] within the discretion of the sentencing court." *Id.* In sentencing a defendant, the sentencing court "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come," including in submissions and arguments, as well as proffers, from attorneys. *Concepcion v. United States*, 597 U.S. 481, 492 (2022); *see, e.g.*, *United States v. Griffin*, 597 F. App'x 20, 20 (2d Cir. 2015) (approving of district court accepting proffered restitution documents). In this case, Judge Hellerstein accepted submissions from both parties, which addressed medical care; heard argument from the defense; and accepted factual proffers from both attorneys (*compare* A. 395 (Government proffering that BOP has medical facilities that can provide radiation and other treatments), *with* A. 410 (Guldi's counsel proffering that his clients are rarely designated to Devens)). Guldi had the "opportunity to rebut" any of the Government's statements about medical care both in his sentencing submission and in the sentencing proceeding, which is sufficient to resolve such a dispute. *See United States v. Preston*, 499 F. App'x 70, 74 (2d Cir. 2012) (holding that defendant had sufficient opportunity to rebut reliability of recorded conversation when he addressed it "both in a written sentencing submission and at the sentencing hearing").

Ultimately, Judge Hellerstein considered how the sentence would provide Guldi with "medical treatment . . . in the most effective manner," which he had to balance with the remaining Section 3553(a) factors,

56

including the need for the sentence to "reflect the seriousness of the offense" and "afford adequate deterrence." 18 U.S.C. § 3553(a)(2)(A), (B), (D). Judge Hellerstein explicitly took all of this into account when sentencing Guldi to a below-Guidelines sentence of 36 months' imprisonment. (*See* A. 397, 410-11). "The particular weight" to give a "mitigating factor[ ]," such as Guldi's medical conditions, "is firmly committed to the discretion of the sentencing judge," and Judge Hellerstein did not abuse that discretion here. *Broxmeyer*, 699 F.3d at 289.

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:     New York, New York
           March 12, 2024

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

JONATHAN L. BODANSKY,
MADISON REDDICK SMYSER,
DANIEL C. RICHENTHAL,
KARL METZNER,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,934 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: KARL METZNER,
*Assistant United States Attorney*